## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| U.S. Tobacco Cooperative Inc., *et al.*[1] | ) | Case No. 21-01511-5-JNC |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## DECLARATION OF KEITH H. MERRICK IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Keith H. Merrick, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1.      I am the chief financial officer ("CFO") of U.S. Tobacco Cooperative Inc. (the "Cooperative"), one of the above-captioned debtors and debtors-in-possession.  The Cooperative is the ultimate parent company of the following related debtors and debtors in possession: U.S. Flue-Cured Tobacco Growers, Inc.; Premier Manufacturing, Inc.; Franchise Wholesale Co., L.L.C.; Big South Distribution, LLC; and King Maker Marketing, Inc. (collectively, the "Subsidiaries," and together with the Cooperative, the "Debtors").

2.      I also have a similar role in each of the Subsidiaries, and I am familiar with the day-to-day operations as well as the business and financial matters, books and records, and employees of the Debtors.

3.      I have been involved in the day-to-day operations of the Debtors since March 1, 2021, when I was hired as CFO.

4.      Except as otherwise indicated, all statements in this declaration (the "Declaration") are based upon (a) my knowledge as CFO; (b) my review of relevant documents, including the

---

[1] The Debtors in these Chapter 11 Cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): U.S. Tobacco Cooperative Inc. (4598); U.S. Flue-Cured Tobacco Growers, Inc. (9823); Premier Manufacturing, Inc. (3251); Franchise Wholesale Co., L.L.C. (7518); Big South Distribution, LLC (4164); and King Maker Marketing, Inc. (4533).  The Debtors' corporate headquarters are located at 1304 Annapolis Drive, Raleigh, NC  27608.

Debtors' books and records, (c) information supplied to me by other members of the Cooperative's management team and/or third-party advisors, (d) my opinion based on my experience and knowledge of the Debtors' operations and financial affairs, and (e) my experience and knowledge concerning the tobacco industry generally.

5.      As the CFO, I participated in the decision to cause the Debtors to file voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code").  Ultimately, the Debtors' boards of directors and/or managing members authorized the bankruptcy filings and the Debtors filed these cases (the "Chapter 11 Cases") on July 7, 2021 (the "Petition Date").

6.      To minimize any adverse effects on their business as a result of the commencement of the Chapter 11 Cases, the Debtors have filed certain contemporaneous motions seeking "first day" relief (collectively, the "First Day Motions").

7.      The goals of the First Day Motions, among other things, are to: (a) continue with the Debtors' operations in the ordinary course of business while operating in chapter 11 with minimal disruption; (b) maintain the confidence and support of key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases.  I have reviewed the First Day Motions, and I believe that the relief they request is necessary to avoid immediate and irreparable harm to the Debtors' businesses, estates, and stakeholders from the filing of the Chapter 11 Cases.

8.      I am authorized to submit this Declaration on behalf of the Debtors in support of the First Day Motions, and to provide additional background regarding the events leading to the filing of the Chapter 11 Cases and the Debtors' efforts to maintain the value of their businesses.

9. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents, or opinion.

## I.     GENERAL BACKGROUND

### A.  The Chapter 11 Cases

10. As discussed above, the Debtors commenced the Chapter 11 Cases on this date by filing voluntary chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Court").

11. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.  General Background

#### a.  Overview

12. The Cooperative is a flue-cured tobacco processor, manufacturer of consumer tobacco products, and merchant selling processed tobacco leaf and byproducts to domestic and international cigarette manufacturers.

13. The Cooperative was established in 1946 under the North Carolina Marketing Act, and its owners comprise over 500 flue-cured tobacco farmers located in the Southeastern region of the United States. Altogether, the Debtors are the largest tobacco cooperative in the United States and together are the most vertically-integrated tobacco company in the industry, operating leaf receiving stations, green leaf threshing and redrying, primary blending, cigarette manufacturing, and wholesale distribution in Cooperative-owned or leased locations in six states.

The Cooperative and its Subsidiaries sell tobacco leaf and byproducts to buyers across the world, process and distribute ten consumer tobacco product brands in the United States, perform contract manufacturing of consumer products for international brands, and produce and sell cutrag and pipe tobacco.

14.    The Cooperative and its Subsidiaries carry out their operations at the following locations:

| Debtor | Location | Operation | Interest |
|---|---|---|---|
| Cooperative | 1304 Annapolis Drive, Raleigh, NC 27608 (the "Corporate Offices") | Corporate Offices | Owned |
| Cooperative | Perkins Warehouse No. 3 at the intersection of Enigma Road and Tifton Road, Street, Nashville, GA 31639 | Green Tobacco Receiving Station and Storage | Leased |
| Cooperative | 1241 South Boston Rd, Danville, VA  24541 | Green Tobacco Receiving Station and Storage | Leased |
| Cooperative | 901 NE Front Street, Mullins, SC 29574 | Green Tobacco Receiving Station and Storage | Owned |
| Cooperative | 350 Golden Eagle Drive, La Crosse, VA  23950 | Green Tobacco Receiving Station and Storage | Leased |
| Cooperative | 1920 Black Creek Rd. SE, Wilson, NC 27893 | Green Tobacco Receiving and Storage | Leased |
| Cooperative | 913 Bridge St, Fuquay-Varina, NC 27526 (the "913 Bridge Street Facility") | Tobacco Storage | Owned |
| Cooperative | 0 Wilbon Road and 608 Wilbon Rd., Fuquay-Varina, NC 27540 (the "608 Wilbon Road Facility") | Tobacco Storage | Owned |
| US Flue-Cured | 250 Crown Blvd, Timberlake, NC 27583 (the "Timberlake Facility") | Manufacturing / Storage | Owned |
| Cooperative | 800 Lewis St, Oxford, NC, 27565 | Warehouse | Leased |
| US Flue Cured | 1444 Old Durham Rd., Roxboro NC 27573 | Warehouse | Leased |
| Cooperative | 311 W. Industry Drive, Oxford, NC 27565 | Warehouse | Leased |
| Cooperative | 540 Tobacco Rd., Oxford, NC 27565 | Warehouse | Leased |

| Debtor | Location | Operation | Interest |
|--------|----------|-----------|----------|
| Cooperative | 209 W. Industry Drive, Oxford, NC 27565 | Warehouse | Leased |
| Premier Manufacturing | 629 Cepi Drive, Chesterfield, MO 63005 | Offices / Warehouse | Leased |
| Franchise Wholesale | 4114 N Pecos Rd, Ste. 105, Las Vegas, NV 89115 | Offices / Warehouse | Leased |
| Franchise Wholesale | 713 N Frontier, Papillion, NE 68046 | Warehouse Facility | Leased |
| Big South | 320 Walling Rd., Bristol, VA 24210 | Offices / Warehouse | Leased |
| Big South | 325 Brogdon Rd., Suwanee, GA, 30024 | Warehouse | Leased |

### b. The Cooperative

15.     The Cooperative is the tobacco acquisition and sale entity for the Debtors.  The Cooperative operates five marketing centers at which it receives, grades and weighs its members' tobaccos located in Nashville, GA, Mullins, SC, Wilson, NC, LaCrosse, VA and Danville, NC, which are regional warehouses where the Cooperative purchases tobacco from members (the "Regional Warehouses").  The Cooperative's next anticipated purchases of approximately 36 million pounds of tobacco leaf will take place from August through November 2021.  The Cooperative either processes the tobacco that it purchases for use in its own consumer products, or else processes it and sells it in bulk to third-party domestic and international cigarette manufacturers and tobacco leaf merchants. The Cooperative ordinarily finances its tobacco purchases through the Credit Facility (as defined below).

16.     The Cooperative's 500,000 square foot manufacturing facility at Timberlake, NC is the only facility in the tobacco industry with all aspects of manufacturing under a single roof: green leaf tobacco processing (stemmery), primary blending, and secondary cigarette manufacturing.  Included in the 500,000 square foot facility is also a Green Storage climate-controlled warehouse constructed to store up to 10 million pounds of green leaf tobacco prior to Stemmery processing.

17.     The Cooperative exists to serve the interests of its membership – flue-cured tobacco farmers.  The Cooperative fulfills that mission through, among other things:

a.  ***Purchasing Member Tobacco Crops.***  The Cooperative purchases tobacco crops from its membership through annual marketing agreements, pursuant to which members deliver a certain quantity of tobacco to the Cooperative in exchange for a price set in advance by tobacco grade.  The Cooperative sets a higher price on tobacco purchases earlier in the year than other tobacco manufacturers, thus benefitting all flue-cured tobacco farmers by preventing large cigarette manufacturers from exercising their bargaining power to drive down prices.  The marketing agreements also provide farmers a market in which to sell tobacco even if other leaf purchasers do not want to buy their crops.

b.  ***Processing and Manufacturing Tobacco.***  Through its Subsidiaries, the Cooperative stores and processes the tobacco purchased from its members.  The Cooperative sells the processed tobacco to cigarette manufacturers and other leaf buyers.  In addition, through its Subsidiaries, the Cooperative manufactures and distributes its own proprietary brands of cigarettes and other consumer tobacco-related products to retailers and sub-distributors.

c.  ***Declaring Dividends***.  The Cooperative returns eligible profits back to its members through cash patronage dividends in accordance with IRS regulations and the federal Capper-Volstead Act of 1922, which governs agricultural cooperatives.

d.  ***Marketing.***  The Cooperative advances the interests of flue-cured tobacco farmers through, among other things, developing international markets for U.S.-grown flue-

cured tobacco, including China and Japan, which have subsequently proven to be the Cooperative's largest markets.

18.     The Cooperative has 50 employees.  In the Cooperative's fiscal year ended April 30, 2021, the Cooperative's revenues were $28.8 million.

### c.  The Subsidiaries

19.     Through the Subsidiaries, the Cooperative processes tobacco and manufactures consumer tobacco products under the brand names Manitou, 1839, 1st Class, Shield, Traffic, Ultra Buy, Wildhorse, Belmore, Ace, Hi-Val, Gold Crest, and Checker.  The Debtors' product line includes cigarettes, pipe tobacco, premium cigars, roll-your-own cigarettes, and cigarette tubes, which the Debtors distribute and sell nationwide.  The Cooperative has five affiliated Subsidiaries, all of which are Debtors in these Chapter 11 Cases:

a.  ***U.S. Flue-Cured Tobacco Growers, Inc.*** ("US Flue-Cured").  US Flue-Cured, a North Carolina corporation, was incorporated in 2004 and is a wholly owned subsidiary of the Cooperative.   US Flue-Cured processes and stores tobacco purchased by the Cooperative.  US Flue-Cured also manufactures the Debtors' consumer products line and provides contract manufacturing and development for third-party brands.  US Flue-Cured has the capacity to process 26,000 pounds of tobacco per hour and annually processes over 35 million pounds of tobacco.  US Flue-Cured employs 95 employees.   In the fiscal year ended April 30, 2021, US Flue-Cured had annual revenue of $98.1 million.

b.  ***Premier Manufacturing, Inc.*** ("Premier Manufacturing").   Premier Manufacturing, a Missouri corporation, was incorporated in 1995 and is a wholly owned subsidiary of the Cooperative.   The Cooperative acquired Premier

Manufacturing in 2011.  Premier Manufacturing is the primary distributor and marketer of the Debtors' consumer tobacco products, providing sales and distribution support and controlling brand relationships with retailers.  Premier Manufacturing's employees provide sales support and create sales and merchandising programs to maintain brand visibility.  Premier Manufacturing leases office space and a warehouse in Chesterfield, Missouri and has 36 employees.  In the fiscal year ended April 30, 2021, Premier Manufacturing had annual revenue of $132.8 million.

c. ***King Maker Marketing, Inc.*** ("King Maker").  King Maker, a New Jersey Corporation, was incorporated in 1994 and is a wholly owned subsidiary of Premier Manufacturing.  The Cooperative acquired King Maker in 2016.  King Maker owned several brands with MSA payment exemption rights.  The acquisition gave the Cooperative an opportunity to expand the number of brands it sells to distributors.   In the fiscal year ended April 30, 2021, King Maker had annual revenue of $14.4 million.  King Maker has no employees.

d. ***Big South Distribution, LLC*** ("Big South").  Big South, a North Carolina limited liability company, was formed in 2004 and is a wholly owned subsidiary of the Cooperative.  Big South supports the Debtors' distribution of consumer products to retailers and sub-distributors in the Southeastern region of the country.  Big South has 14 employees and leases warehouses in Bristol, VA and Suwanee, GA.  In the fiscal year ended April 30, 2021, Big South had annual revenue of approximately $37.1 million.

    e.  **_Franchise Wholesale Co., L.L.C._** ("<u>Franchise Wholesale</u>").  Franchise Wholesale, a Missouri limited liability company, was formed in 2004 and is a wholly owned subsidiary of the Cooperative.  Franchise Wholesale was acquired by the Cooperative in 2011.  Franchise Wholesale supports the Debtors' distribution of consumer products to retailers and sub-distributors in the Midwest and West Coast regions of the country.  Franchise Wholesale owns warehouses in Papillion, NE and Las Vegas, NV, and has 29 employees.  In the fiscal year ended April 30, 2021, Franchise Wholesale had annual revenues of $66.2 million.

    C.  <u>Corporate and Governance Structure</u>

    20.    The Cooperative is governed by a nine-person board of directors (the "<u>Board</u>"). Eight of the seats correspond to specific geographic regions and are elected by members located in that region.  The remaining seat is the "Public Director," who is appointed by the governor of North Carolina.  Those same nine directors also serve on the boards of all of the Cooperative's subsidiaries, with the exception of King Maker, which is governed by a separate board consisting of seven of the Cooperative's nine public directors and the Chief Executive Officer and Chief Financial Officer of the Cooperative.  An organization chart reflecting the Debtors' corporate structure is attached hereto as <u>Exhibit A</u>.  A list of each Debtor's current management is attached hereto as <u>Exhibit B</u>.

    D.  <u>Recent Operating Results</u>

    21.    After intercompany transaction eliminations, the Debtors' consolidated annual revenues in 2021 were approximately $260.4 Million and net income in 2021 was approximately $6.6 million.

### E.  **Credit Facility and Debt Structure**

22.    The Cooperative is a borrower under a syndicated credit facility (the "Credit Facility") pursuant to that certain Credit Agreement, dated as of November 15, 2016, by and between the Cooperative, the lenders from time to time party thereto, and Truist Bank (by merger to Branch Bank and Trust Company), in its capacities as Administrative Agent, Issuing Bank and Swingline Lender (the "Administrative Agent"), as amended by that certain (i) First Amendment to Credit Agreement and Waiver, dated as of June 27, 2017, (ii) Second Amendment to Credit Agreement and Waiver, dated as of July 29, 2019, (iii) Third Amendment to Credit Agreement and Waiver, dated as of February 28, 2020, (iv) Fourth Amendment to Credit Agreement, dated as of May 22, 2020, and (v) Fifth Amendment to Credit Agreement, dated as of March 12, 2021 (as so amended, and as the same may be further amended, restated, supplemented, or modified from time to time, the "Credit Agreement").

23.    Under the Credit Agreement, the Cooperative had access to a revolving credit facility of up to $105 million under Tranche A (as defined therein) and $35 million under Tranche B (as defined therein).  Each of the Subsidiaries – Premier Manufacturing, US Flue-Cured, Big South, Franchise Wholesale and King Maker (collectively, the "Guarantors") – are guarantors under the Credit Facility.

24.    As of July 1, 2021, the lender parties to the Credit Facility were Truist Bank; AgCarolina Farm Credit, ACA; CoBank, ACB; Fifth Third Bank, National Association; and Pinnacle Bank (collectively with the Administrative Agent, the "Bank Group").

25.    Pursuant to the Credit Agreement, the Cooperative entered into (i) that certain *Revolver Note* in favor of Pinnacle Bank, dated March 12, 2021, in the principal amount of $17,500,000.00; (ii) that certain *Second Amended and Restated Revolver Note,* dated March 12,

2021, in favor of AgCarolina Farm Credit, ACA, in the principal amount of $16,774,193.00; (iii) that certain *Second Amended and Restated Revolver Note,* dated March 12, 2021, in favor of CoBank, ACB, in the principal amount of $16,774,193.00; (iv) that certain *Second Amended and Restated Revolver Note,* dated March 12, 2021, in favor of Fifth Third Bank, National Association, in the principal amount of $20,000,000.00; and (v) that certain *Second Amended and Restated Revolver Note,* dated March 12, 2021, in favor of Truist Bank in the principal amount of $68,951,614.00 (collectively, the "Tranche A Revolver Notes").

26.    In connection with the Credit Facility, each of the Debtors (together, the "Grantors") granted first priority security interests (the "Security Interests") in all or substantially all of their personal property pursuant to that certain *Amended and Restated General Security Agreement,* dated March 24, 2016 (the "Security Agreement"), as amended pursuant to that certain *Joinder and Reaffirmation Agreement*, dated November 15, 2016, including with respect to the following property:

| Grantor | Depository Bank/Securities Intermediary | Account Number (-last 4 digits) | Type of Account |
|---|---|---|---|
| Cooperative | Truist Bank | -8253 | Checking–Operating Account |
| Cooperative | Truist Bank | -8326 | Checking–Market Centers Account |
| Cooperative | Truist Bank | -8334 | Deposits–Collateral Reserve Account |
| Cooperative | Truist Bank | -8971 | Concentration Account |
| Cooperative | Truist Bank | -9930 | Checking – Redemption Account |
| Premier | First Horizon Bank | -1490 | Depository ZBA |
| Premier | First Horizon Bank | -1413 | Checking Account |
| Franchise Wholesale | Nevada State Bank | -1748 | Checking Account |

| Grantor | Depository Bank/Securities Intermediary | Account Number (-last 4 digits) | Type of Account |
|---------|------------------------------------------|-------------------------------|-----------------|
| Franchise Wholesale | First Horizon Bank | -1693 | Depository ZBA |
| Franchise Wholesale | First Horizon Bank | -1602 | Checking Account |
| Franchise Wholesale | Pinnacle Bank | -6710 | Checking Account |
| Big South | Truist Bank | -8318 | Checking Account |
| Big South | Truist Bank | -1388 | Collateral Reserve Account |
| US Flue-Cured | US Bank | -1372 | Escrow |
| US Flue-Cured | Truist Bank | -8261 | Operating Account |
| US Flue-Cured | Truist Bank | -1361 | Collateral Reserve Account |
| King Maker | Truist Bank | -3344 | Checking Account |
| Cooperative | Wells Fargo Bank | -5386 | Pension Plan Custodian |
| Cooperative | Truist Bank Investment Account | -1181 | Investment Account |

27.     The Cooperative and US Flue-Cured also entered into certain deeds of trust granting first priority mortgages to the Administrative Agent with respect to the Corporate Offices, the Timberlake Facility, the 913 Bridge Street Facility and the 608 Wilbon Road Facility.

28.     As of July 1, 2021, the outstanding balance under the Tranche A Revolver Notes was $99,603,274.33.  No outstanding balance exists with respect to Tranche B.

29.     The Cooperative is also party to that certain *Master Equity Lease Agreement* (the "Master Lease") with Enterprise FM Trust ("Enterprise"), as amended from time to time, pursuant to which it leases certain vehicles for use in the operation of the Debtors' businesses.

30.     The Debtors estimate that they have approximately $2,500,000 of trade and other unsecured debt as of the Petition Date.[2]

---

[2] This amount is approximated based on information reasonably available to me as of the preparation of this Declaration and may not reflect payments made or debts incurred in the ordinary course of business in the immediate

**F.  Events Leading to the Chapter 11 Cases**

**a.  History of Operations**

31.     In pursuing its longstanding and continuing mission to serve the interests of flue-cured tobacco farmers, the Cooperative played an important role from 1946 to 2004 in administering the Tobacco Price Support Program (the "Program").  Under the Program, growers of flue-cured tobacco agreed to limit their production of tobacco in exchange for guaranteed minimum prices set by the federal government.  If buyers of flue-cured tobacco (*e.g.,* independent tobacco leaf merchants or cigarette companies) did not purchase members' tobacco above the federal minimum price guarantee, the Cooperative would "purchase" the tobacco.  To finance the purchase of tobacco, the Cooperative borrowed funds from the Commodity Credit Corporation (the "CCC"), a division of the United States Department of Agriculture.  The Cooperative then processed, stored, and marketed this tobacco, and used proceeds of the sale to pay off the CCC loans.

32.     Under the Program, every flue-cured farmer seeking to sell tobacco to the Cooperative was required to be a member and pay $5.00 for a stock certificate.  Each farmer also signed a marketing agreement making the Cooperative his or her agent and received an identification card with an "FC number".  Historically, individual farmers often obtained multiple FC numbers, due to the necessity of providing the identification card when delivering tobacco to the Cooperative for sale.  If the farmer had forgotten the card, it was easier for the farmer to purchase a new FC card for $5.00 than to retrieve the forgotten one.  During the Program's existence, over 800,000 FC numbers were issued to the Cooperative's member-growers.

---

period leading up to the filing of the Chapter 11 petitions.  The Debtors will update this figure in connection with the filing of the Schedules and Statements (as such terms are defined herein).

33.     Throughout its history, the Program was under political attack.  In October 2004, Congress enacted the Fair and Equitable Tobacco Reform Act ("FETRA"), terminating the Program.  The Cooperative had long been aware of the Program's unpopularity and had notified its members on multiple occasions of the practical necessity of building a reserve in the event the Program was terminated.

34.     From 1979 through 2005, the Cooperative accumulated a reserve of approximately $300,000,000, which largely comprised:

    a.  $4-5 million from the $5.00 membership fees paid by members.

    b.  $26 million held as capital equity credits resulting from profits earned in the 1967-1973 crop years, in which the Cooperative sold the crops for an amount above the guaranteed price;

    c.  $110 million resulting from the sale of tobacco ceded by the CCC in 1990 after payment of encumbering loans for the 1982-1984 crop years;

    d.  $81 million resulting from the sale of tobacco ceded by the government in 2005 (from crop years 2002-2004) in conjunction with FETRA. As part of this, the government informed the Cooperative it had taken title to this tobacco and then gave it to the Cooperative pursuant to FETRA and with the instruction that the Cooperative could use the proceeds in "any manner it desired," which it did after paying $45 million in corporate tax; and

    e.  Retained earnings resulting from interest.

35.     Prior to the passage of FETRA, the Board determined and forecasted to its members that if the Program ended, the Cooperative would continue to operate in order to continue its mission of supporting flue-cured tobacco farmers.  Accordingly, contemporaneous with the passage of FETRA, the Cooperative began purchasing its members' tobacco directly and implemented a vertical integration strategy in order to promote and sell this tobacco. The Cooperative's strategic decisions included:

    a.  Purchasing the 500,000 sq. foot Timberlake facility in 2004, allowing the Cooperative to begin manufacturing consumer products.

    b.  Launching the Cooperative's 1839 brand of consumer cigarettes in 2007.

    c.  Acquiring cigarette manufacturers and distributors Premier Manufacturing and Franchise Wholesale in 2011, and King Maker in 2016, thus acquiring cigarette brands Ace, Hi-Val, Gold Crest and Checker.  The acquisitions allow the Cooperative to sell member-grown tobacco in cigarettes that were previously manufactured in India and take advantage of certain tax exemptions applicable solely to Premier Manufacturing and King Maker brands.

    d.  Building the green leaf storage facility in 2017, which is located closer to the Timberlake processing operations than the Cooperative's previous storage facility and allowed the Cooperative to process a greater percentage of green tobacco purchased from members.

    e.  Developing international markets in order to expand the market for flue-cured tobacco, resulting in significant sales to Chinese and Japanese purchasers.

**b.  Equity and Other Interests in the Cooperative**

36.    The Cooperative's Articles of Incorporation provide that growers have to patronize the Cooperative in order to remain eligible members.  Growers are required to enter into annual marketing agreements with the Cooperative, pursuant to which members deliver a certain quantity of tobacco in exchange for a price set in advance by the Cooperative.  Currently there are approximately 553 members of the Cooperative (the "<u>Active Members</u>").

37.    In addition to the Active Members, previous members of the Cooperative may hold certain claims against and/or equity interests in the Cooperative, as described below.

38.    ***1967-73 Capital Equity Credits.***  For crop years 1967 through 1973, the Cooperative sold tobacco it purchased from its members at a price above the federal minimum price guarantee, thus earning a profit.  The Cooperative distributed a portion of that profit to its members, and retained the remaining proceeds (approximately $26.8 million) as reserves. The Cooperative issued capital equity credits (the "<u>1967-73 Capital Equity Credits</u>") to growers with

respect to that profit (the "1967-73 Capital Equity Credit Holders") that were redeemable at the Board's discretion.

39.    Between 2013 and 2017, the Cooperative's Board exercised its discretion to offer 1967-73 Capital Equity Credit Holders the opportunity to redeem their credits. As of May 31, 2017, only approximately $5.5 million of the 1967-73 Capital Equity Credits had been redeemed. According to the Cooperative's records, the total number of parties who may currently be 1967-73 Capital Equity Credit Holders is approximately 204,500.

40.    ***2010-16 Capital Equity Credits.***    In crop years 2010-2016 the Cooperative generated patronage-eligible income.  That income was partially distributed to grower-members in cash patronage dividends and the remainder was retained as reserves.  The Cooperative issued capital equity credits (the "2010-16 Capital Equity Credits") to members with respect to those reserves (the "2010-16 Capital Equity Credit Holders") that were redeemable at the Board's discretion.  According to the Cooperative's records, the total amount of 2010-16 Capital Equity Credits is approximately $14.6 million.  The number of parties who may currently be 2010-16 Capital Equity Credit Holders is approximately 1250.

   c.    **Lawsuits against the Cooperative**

41.    Starting in January 2005, various groups of Cooperative members initiated direct and class-action litigation against the Cooperative claiming, *inter alia*, that the Cooperative had failed to appropriately allocate monies that were held in reserve; that as the Cooperative's primary purpose was administering the Tobacco Price Support Program, the Program's end meant the Cooperative should have ended and/or distributed some or all of the reserve; that the Cooperative had improperly removed FC numbers from the member registry; and that the acts of the

Cooperative were *ultra vires*, in breach of its agreements with its members, unfair and deceptive trade practices, or all three.

42. These lawsuits were filed primarily in Georgia and North Carolina. In Georgia, the Cooperative successfully obtained dismissal of the lawsuit. *See Rigby v. Flue-Cured Tobacco Co-op.*, 327 Ga. App. 29, 34, 755 S.E.2d 915, 921 (2014). In North Carolina, two class action suits remain pending, captioned *Speaks v. U.S. Tobacco Cooperative, Inc.*, Case No. 5:12-cv-729-D, pending in the U.S. District Court for the Eastern District of North Carolina (the "Federal Court Litigation"), and *Lewis v. FCTC*, Case Nos. 05 CVS 188, 05 CVS 1938 (the "State Court Litigation," and with the Federal Court Litigation, the "Class Actions"), pending in the General Court of Justice, Superior Court Division for the State of North Carolina, County of Wake (the "State Court").

43. In 2018, the Cooperative reached a settlement in the Federal Court Litigation that was ultimately approved by Chief U.S. District Judge James C. Dever III. It is my understanding that this settlement would have extinguished the State Court Litigation. In 2019, however, the U.S. Court of Appeals for the Fourth Circuit reversed Judge Dever's order approving the settlement, and the case was remanded to the district court. *See Sharp Farms v. Speaks*, 917 F.3d 276 (4th Cir. 2019). On remand, the district court subsequently entered an order dismissing the Federal Court Case for failure to state a claim. The *Speaks* plaintiffs appealed that ruling to the U.S. Court of Appeals for the Fourth Circuit, and that appeal remains pending.

44. According to the Cooperative's records, the total number of parties who may be members of the certified classes (the "Class Plaintiffs") is in the hundreds of thousands, as any person that purchased or was issued one of the 800,000 FC numbers issued to grower-members in the Cooperative from 1946 – 2011 is a member of the class. Approximately 204,500 class

members are 1967-73 Capital Equity Holders.  The Cooperative has records with the addresses of the Class Plaintiffs that were collected at or shortly after the time the FC numbers were issued. Given (a) the amount of time that has passed, (b) the fact that many of the addresses were collected prior to the adoption of the Emergency 911 addressing system in North Carolina and South Carolina, and (c) that certain of the growers have since passed away, the addresses are inaccurate and not up-to-date.  This is evidenced by the fact that so few of the 1967-73 Capital Equity Credit Holders elected to redeem their interests.

45.     Recent developments in the State Court Litigation set in motion events that contributed to the Debtors' decision to commence these Chapter 11 Cases.  On April 23, 2021, the State Court entered its *Memorandum and Order on the Parties' Cross-Motions for Summary Judgment* (the "April 23 Order").  In the April 23 Order, the State Court held, among other things, that:

   a.  The Cooperative had improperly removed roughly 700,000 FC numbers from its registration rolls, and therefore the $5.00 associated with each FC number stock is owed as damages.

   b.  Once the Cooperative opened the 1967-1973 Capital Equity Credits for redemption in 2010, it could not close that redemption period, and thus the remaining $21 million in certificates is owed as damages.

   c.  The Cooperative's capital reserve should have been allocated (resulting in certificates of interest to contributing members) as all the proceeds comprising the reserve were patronage income, including the post-tax net of $110 million resulting from the sale of tobacco ceded by the CCC in the 1990s, and the pre-tax net of $126 million resulting from tobacco ceded by the CCC in 2005.

   d.  In not distributing the $126 million in proceeds from the sale of tobacco ceded to the Cooperative from the CCC at FETRA, the Cooperative committed an unfair and deceptive trade practice under Chapter 75 of the North Carolina statutes.

46.     On May 21, 2021, the Cooperative filed a notice of appeal of the April 23 Order to the Court of Appeals of North Carolina.  The filing of the Notice of Appeal automatically stayed the State Court Litigation pursuant to N.C. Gen. Stat. § 1-294.  The appeal remains pending.

47.     On May 12, 2021, the Administrative Agent issued a letter to the Cooperative on behalf of the Bank Group (the "Reservation of Rights Letter").  In the Reservation of Rights Letter, the Administrative Agent alleged, among other things, that:

a.  The State Court's entry of the April 23 Order constituted a default under section 7.01(j) of the Credit Agreement and reserved all rights to exercise remedies thereunder.

b.  As a result of the entry of the April 23 Order, the condition precedent to future Borrowings under the Credit Agreement that no default shall have occurred was not satisfied, and accordingly "Lenders and the Issuing Bank are not under any obligation [to extend] any further Advances or to issue any Letter of Credit."

48.     On June 24, 2021, the Administrative Agent issued a letter to the Cooperative on behalf of the Bank Group (the "Reserve Letter").  In the Reserve Letter, the Administrative Agent stated, that as a result of the April 23 Order, it had created a reserve against the Tranche A Borrowing Base and Tranche B Borrowing Base (the "Class Action Litigation Reserve") in the total amount of $140,000,000.00.  The Administrative Agent alleged that the creation of the Class Action Litigation Reserve created an overadvance under the terms of the Credit Agreement (the "Overadvance"), which effectively obligated the Cooperative to immediately repay the full amounts borrowed under Tranche A Revolver Notes and prohibited the Cooperative from obtaining further advances under the Credit Facility.

49.     On July 2, 2021, the Administrative Agent issued a letter to the Cooperative on behalf of the Bank Group (the "Default Letter").  In the Default Letter, the Administrative Agent (i) declared a default under the Credit Agreement based on the Borrower's failure to cure the Overadvance and (ii) accelerated all amounts due under the Tranche A Revolver Notes.

## II.    <u>THE FIRST DAY MOTIONS</u>

50.    The Debtors have filed a number of First Day Motions which address issues necessary to operate during the pendency of the Chapter 11 Cases.  The Debtors have also requested that the Court conduct a hearing as soon as possible to hear the First Day Motions (the "<u>First Day Hearing</u>").  A description of each of the First Day Motions is provided below.

### A.  <u>Motion for Joint Administration of Chapter 11 Cases.</u>

51.    The Debtors request, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the entry of an order directing consolidation of these Chapter 11 Cases for procedural purposes only (the "<u>Joint Administration Motion</u>").

52.    I believe that the joint administration of the Chapter 11 Cases will save the Debtors and their estates substantial time and expense because it will remove the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Further, I believe that joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The Bankruptcy Administrator for the Eastern District of North Carolina (the "<u>Administrator</u>") and other parties in interest will similarly benefit from joint administration of the Chapter 11 Cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

53.    I believe that joint administration will not adversely affect creditors' rights because the Joint Administration Motion requests only the administrative consolidation of the estates, and does not seek substantive consolidation.  As such, each creditor will continue to hold its claim against a particular Debtor's estate after the Joint Administration Motion is approved. Accordingly, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates, and all parties in interest, and should be granted in all respects.

**B. Debtors' Motion for Entry of an Order (I) Extending the Debtors' Deadlines to File Lists of Equity Holders, Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief.**

54.     The Debtors request the entry of an order, pursuant to sections 105(a) and 521 of the Bankruptcy Code and Rules 1007 and 9006 of the Bankruptcy Rules, setting a deadline forty-five (45) days after the Petition Date by which the Debtors must file their respective schedules of assets, liabilities, and executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") (the "Schedules and Statements Extension Motion").

55.     The additional time requested in the Schedules and Statements Extension Motion should help to ensure that such documents are as accurate as possible.  The additional time will also help ensure that the relevant information is fully processed through the Debtors' information systems and can be incorporated into the relevant schedules.  Based on the foregoing, and due to the other pressing activities in which the Debtors and their professionals are engaged at this time, I believe that additional time to finalize the Schedules and Statements is warranted under the circumstances.

**C.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Shippers, Warehousemen, and Other Lien Claimants, and (II) Granting Related Relief.**

56.     The Debtors seek authority (the "Warehouse and Shipper Motion") to continue to pay, in the ordinary course of business, prepetition claims of shippers, warehousemen, and other lien claimants who have or may have state law remedies available to secure payment of their respective claims.

57.     The Debtors' raw materials, finished products, inventory and other goods are stored at warehouses, including, without limitation, warehouses that are operated by third-party

warehousemen (collectively, the "Warehousemen").  Additionally, the flow of raw materials, finished products, inventory and other goods to and amongst the Debtors, and ultimately to third-party manufacturers, merchants, retailers and sub-distributors, depends significantly on the services provided by, among others, various freight forwarders, common carriers, maritime carriers, contractors, shippers, truckers, and customs agents (collectively, the "Shippers").  As a result, in the ordinary course of business, Shippers and Warehousemen regularly have possession of the Debtors' raw material, finished products, inventory and other goods.  The Debtors estimate that more than $9 million worth of goods are currently in transit.

58.    The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have prepetition claims for goods that (i) are being stored as of the Petition Date, (ii) are being delivered or were delivered to the Debtors' customers prior to the Petition Date, or (iii) are being delivered or were delivered to the Debtors prior to the Petition Date (the "Shipping and Warehousing Claims").

59.    Additionally, the Debtors from time to time at their discretion utilize various contractors, repair companies, and maintenance companies that install, repair, and provide parts for specialized equipment used by the Debtors in their business, and conduct repairs and improvements to the Debtors' warehouses (collectively, the "Other Lien Claimants"), whose services are also essential to the Debtors' operations.  The claims of any and all Other Lien Claimants could give rise to a lien against the Debtors' equipment or facilities (the "Lien Claimant Claims").

60.    If the Debtors fail to pay for the goods or services rendered to them by Shippers, Warehousemen, or Other Lien Claimants, under applicable non-bankruptcy law, it is my understanding that these entities may be entitled to assert certain liens against the Debtors and their

property. The Debtors therefore seek authority to make undisputed payments on the Shipping and Warehousing Claims and the Lien Claimant Claims, as the Debtors, in their business judgment, determine are necessary or appropriate.  Such payments are not expected to exceed $200,000.00

**D. Debtor's Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on account of Prepetition Amounts Due; (II) Deeming Utility Providers Adequately Assured of Future Performance; (III) Authorizing the Debtors to Establish the Adequate Assurance Account and Pay the Adequate Assurance Deposits; (IV) Establishing Procedures for Objection to the Adequate Assurance Procedures; and (V) Granting Certain Related Relief.**

61.     In connection with operating their business, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, waste disposal, natural gas, telecommunication, phone, internet, and other similar services (together, the "Utility Services") from various utility companies (collectively, the "Utility Providers").

62.     The Debtors request (the "Utilities Motion") that the Court enter an order: (1) prohibiting the Debtors' Utility Providers from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts due; (2) determining that the Utility Providers are adequately assured of future payment; (3) authorizing the Debtors to establish an adequate assurance deposit account and to pay an adequate assurance deposit in the amount of the average monthly costs for Utility Services; and (4) establishing procedures by which parties-in-interest may object to the relief sought in the Utilities Motion.

63.     The non-exclusive list of Utility Providers attached as Exhibit A to the Utilities Motion is correct and accurate to the best of my knowledge.  To provide additional assurance of payment to the Utility Providers, the Debtors propose to deposit into a segregated account the amount of $156,041.7 (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one month of the Debtors' Utility Services, calculated based on the Debtors'

average utility expenses over the twelve month period ending May 2021, and excludes Utility Services billed directly to the Debtors' landlords and any surety bonds. The Adequate Assurance Deposit will be held in a segregated account (the "Adequate Assurance Account") for the benefit of the Utility Providers and for the duration of these Chapter 11 Cases and may be applied to any postpetition payment defaults owed to the Utility Providers by the Debtors. The Adequate Assurance Deposit will be held by the Debtors, and no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

64.    Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these Chapter 11 Cases. The Debtors' businesses operate at approximately 19 different warehouse and office locations, which require electricity, telecommunications, internet, water, waste management (including sewer and trash), and other utility services to operate. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely impacted, and such disruption would jeopardize the Debtors' ability to administer their Chapter 11 Cases by adversely affecting customer goodwill and employee relations, which, in turn, would negatively affect the Debtors' revenues. Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

E.  **Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay and Perform All Employee Obligations, (B) Directing Banks to Honor All Related Employee Obligations, and (C) Granting Related Relief.**

65.    The Debtors have requested that this Court enter an order (I) authorizing (a) payment of pre-petition wages, salaries, and employee benefits, (b) reimbursement of employee business expenses, and (c) payment of other employee-related amounts; and (II) authorizing

applicable banks and other financial institutions to receive, process, honor, and pay all checks and drafts drawn on debtors' bank accounts relating to the foregoing (the "Wage Motion").

66.    Regarding the Debtors' current employees, the continued maintenance of employee pay and benefits is essential to the ongoing and valued services of the Debtors' employees. Accordingly, the Debtors have sought authority to pay certain pre-petition obligations to their employees.  These pre-petition obligations include various sums for: wages and salaries, federal and state withholding taxes, contributions to employee benefit plans and payment of health insurance claims and all other employee benefits that the Debtors pay in the ordinary course of business, as well as reimbursable expenses as defined in the Wage Motion (collectively, the "Employer Obligations").  Furthermore, as a service to its employees, the Debtors withhold certain amounts from their employees' paychecks for the benefit of designated recipients for various purposes, including, without limitation, the payment of wage garnishments.  The Debtors withhold such amounts and pay them directly to the appropriate entity.

67.    As of the Petition Date, the Debtors' workforce consists of approximately 224 employees, of which all but three are full time (the "Employees"), 125 are salaried, and 99 are paid on an hourly basis (and two of whom are on a leave of absence).  Each Debtor pays its own employees directly, each on its own payroll schedule.

68.    The Cooperative has 50 employees, of which 35 are salaried (paid bi-weekly), 9 of whom are hourly (paid weekly), and 6 of whom are seasonal/grader employees (paid semi-monthly).  U.S. Flue-Cured has 95 employees, of which 28 are salaried (paid bi-weekly), and 67 are hourly (paid weekly).  Premier has 36 employees, of which 3 are hourly (one of which is part-time) (paid semi-monthly), and 33 are salaried (paid semi-monthly).  Franchise Wholesale has 29 employees, of which 10 are hourly (paid semi-monthly) and 19 are salaried (paid semi-monthly).

Big South has 14 employees, of which 10 are hourly (paid weekly) and 4 are salaried (paid weekly). King Maker does not have its own employees. The Employees are not unionized.

69.     In order to ensure that their current employees are paid in the ordinary course when compensation payments become due, the Debtors have specifically requested that the order approving the Wage Motion also provide that the applicable banks are authorized to service and administer the accounts as described above without interruption, and, in the ordinary course of business, to receive, process, honor, and pay any and all electronic or wire transfers, checks, and drafts drawn on the Debtors' accounts, whether presented for payment before or after commencement of these Chapter 11 Cases by the holder thereof, provided that sufficient funds are in the Debtors' accounts to cover them.

70.     **Wages, Salaries and Compensation.**    The Employees are paid wages (collectively, the "Wages") either weekly, bi-weekly, or semi-monthly, as indicated above. The bi-weekly employees are all paid on the same lockstep bi-weekly schedule, and the semi-monthly employees are all paid on the fifteenth and last days of the month. The weekly and bi-weekly employees all receive their pay on a Friday, and the funds leave the account of the applicable Debtor on the Thursday immediately prior. Similarly, the funds to pay the semi-monthly employees leave the account of the applicable Debtor on the fourteenth and the second-to-last day of each month.

71.     As of the Petition Date, the Cooperative's gross weekly payroll (applicable to its hourly employees) is $6,007. The Cooperative's gross bi-weekly payroll (applicable to its salaried employees) is $186,784. The Cooperative's gross semi-monthly payroll (applicable to its seasonal/grader employees) is $9,750.00.

72.     As of the Petition Date, US Flue-Cured's gross weekly payroll (applicable to its 63 hourly employees) is $51,063.  US Flue-Cured's gross bi-weekly payroll (applicable to its 28 salaried employees) is $88,006.

73.     As of the Petition Date, Premier Manufacturing's gross semi-monthly payroll (applicable to all 36 of its employees) is $120,500.

74.     As of the Petition Date, Franchise Wholesale's gross semi-monthly payroll (applicable to all 29 of its employees) is $59,755.96.

75.     Finally, as of the Petition Date, Big South's gross weekly payroll (applicable to all 14 of its employees) is $13,458.

76.     The next upcoming pay date for the bi-weekly employees is Friday July 9th, for which the aggregate payroll for all Debtors (including weeklies and bi-weeklies) is $345,318.  The Debtors paid the July 9th payroll early, and, as of the Petition Date, all disbursals for the July 9th payroll date have already been made.  The aggregate payroll for the following Friday (July 16th) covering the weekly pay period of July 4 – July 10, 2021 will be approximately $70,528, of which $40,302 may be deemed to have arisen pre-petition.  The aggregate payroll for the semi-monthly payroll on July 15th, covering the period of July 1 – July 15, 2021, will be approximately $179,856, of which $83,933.00 may be deemed to have arisen pre-petition.

77.     As of the Petition Date, approximately $250,384.00 in gross Wages are accrued and owed to Employees on the payroll dates noted above.  As more fully described in the Wage Motion, the Debtors request authority to pay all unpaid Wages to the Employees, including any amounts owed for under applicable paid-time-off policies, and to continue to otherwise pay the Employees in the ordinary course of business.

78.     As of the Petition Date, the Debtors have also accrued approximately $12,909.54 in pre-petition payroll tax obligations, which will need be withheld from the next upcoming applicable paychecks.  The Debtors seek authority to honor and process their pre-petition obligations with respect to the payroll taxes, including authority to pay the payroll taxes to the applicable taxing authorities, as needed.

79.     In addition to this sum, the Debtors have been holding, and accumulating, social security taxes pursuant to a certain provision of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") that allowed employers to defer the employer social security tax for 2020.  The Debtors are presently holding a total of approximately $630,000 in deferred social security tax funds (the "Deferred Social Security Tax").  Pursuant to the CARES Act, the Debtors are required to remit half of the Deferred Social Security Tax to the IRS by December 31, 2021, and the remaining half by December 31, 2022.  The Debtors seek authority to make these payments, as necessary, in the ordinary course of business.

80.     Although the Debtors seek authority to make the requested payments, they do not believe that the Court should direct them to pay any specific claim. Additionally, notwithstanding anything to the contrary, the payment of any claims pursuant to the Order approving the Wage Motion, if entered, shall neither (i) make such obligation an administrative expense of the Debtors' estates nor (ii) constitute approval by the Court of any employee plan or program including any bonus plans.

81.     **Employee Benefits.**  The Debtors have established certain benefit plans for eligible Employees, including without limitation medical, dental, and vision plans, workers' compensation insurance, life insurance, disability insurance, retirement plans, and other benefits described in more detail below (all together, the "Employee Benefit Plans").   In general, all full-time

Employees are eligible to participate in the Employee Benefit Plans.  The Employee Benefit Plans include the following:

82.     The Debtors provide eligible employees with medical insurance benefits through a self-insured group health insurance plan (the "Self-Insured Group Health Insurance Plan") administered by UMR, Inc. ("UMR").  The Debtors wish to honor Employee claims under the Self-Insured Group Health Insurance Plan, including claims that may have accrued pre-prepetition, and as of June 30, 2021 have budgeted approximately $342,000 for potential accrued unpaid health care costs.  UMR's monthly charge for administering the Self-Insured Group Health Insurance Plan is approximately $66,000, payable one month in arrears (the "UMR Payment").  The Debtors maintain a stop-loss policy (the "Stop-Loss Policy") through Voya Financial, Inc. ("Voya") to limit their potential liability under the Self-Insured Group Health Insurance Plan, under which benefits paid to Employees in excess of certain maximums (specific stop-loss deductible of $105,000 for any one member of the policy; aggregate stop-loss specific deductible of $55,000) are reimbursed to the Self-Insured Group Health Insurance Plan.  The monthly premiums on the Stop-Loss Policy are funded by the Debtors through a portion of the UMR Payment.

83.     The Debtors also maintain other health insurance plans and similar benefits for their Employees, including dental and vision coverage, life insurance, accidental death and dismemberment, and long term disability coverage (together with the Self-Insured Group Health Insurance Plan, the "Insurance Plans"). Unlike the Self-Insured Group Health Insurance Plan, the Debtors' other Insurance Plans and benefits are not "self-insured," meaning that the Debtors' only outlays are premium payments or similar charges to the applicable provider.  In addition, the Debtors offer their Employees the ability to participate in certain "employee-funded" benefit programs, in which the Employees' use their own funds to purchase benefits.  In total, the

premiums for all of the Insurance Plans, including voluntary Employee-funded plans, average $33,000 per month, of which approximately $21,300 is funded by the Debtors, and approximately $11,700 is funded by the Employees. The premiums on the Insurance Plans are typically due on the first day of the month, and the Debtors believe that all premiums for July 2021 have already been paid as of the Petition Date.

84.      The Debtors offer Employees the ability to contribute a portion of their pre-tax Wages into flexible spending accounts (each, an "FSA") and health savings accounts (each, an "HSA"), for eligible healthcare, dependent care, and commuter expenses, as more fully described in the Wage Motion.

85.      The Debtors maintain a retirement savings plan with Fidelity for all full-time Employees in accordance with the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"), as fully described in the Wage Motion. Employees may contribute funds to the 401(k) Plan through wage deductions up to the IRS limit. The Debtors make matching payments equal to the first 3% of each Employees' own contribution, plus half of the next 2% of each Employee's own contribution.

86.      In the past, the Debtors maintained a pension plan (the "Pension Plan") for certain of their Employees. Although the Pension Plan has been frozen since 2010, the Pension Plan still exists for the benefit of certain former Employees. Although the Pension Plan is no longer a benefit provided to active Employees, the Debtors would nonetheless like to continue to maintain it according to their ordinary pre-petition practices, as their former Employees who participate in the Pension Plan are relying on it for their retirement. The Debtors' only ongoing outlay in connection with the Pension Plan is the administrative fees of its services providers, Wells Fargo, Cap Trust and Findley, Inc., which are fully described in the Wage Motion.

87.     By the Wage Motion, the Debtors seek authority to continue to provide the Employee Benefit Plans outlined above and in the Wage Motion; to pay, in the ordinary course of business, any obligations, charges, fees and premiums that may arise, or that may have arisen, under the Employee Benefit Plans, whether accrued pre- or post-petition; and to authorize Banks to honor checks that were issued pre-petition relating to the Employee Benefit Plans.

88.     **Worker's Compensation Insurance.**     The Debtors maintain workers' compensation insurance to provide Employees with coverage for claims arising from or related to their employment, and to satisfy the Debtors' obligations arising under or related to any claims in connection therewith, through Key Risk Insurance Company.  The Debtors' total annual Workers' Compensation Insurance premium for their most recent policy period was approximately $152,370.  The present policy term for the Debtors' Workers' Compensation Insurance Policy has already been paid in full, and expires on July 31, 2021.  The Debtors intend to renew their policy this month, and anticipate that the premium price will not change significantly.  The Debtors request authority to continue to maintain its Workers' Compensation Insurance Policy in the ordinary course of business.

89.     **Pre-Petition Reimbursable Expenses.**  The Debtors reimburse Employees for certain ordinary course expenses incurred within the scope of Employees' employment, including travel, lodging, transportation, meals, and other miscellaneous expenses (collectively, the "Reimbursable Expenses").  Reimbursable Expenses incurred by Employees in furtherance of the Debtors' business are paid directly by Employees, who then submit expense reports to the Debtors through their SAP Concur software in accordance with the Debtors' reimbursement policy.  Some Employees may not yet have submitted expense reports for Reimbursable Expenses accrued shortly before the Petition Date.  As of the Petition Date, the Debtors estimate that approximately

$835.00 may be outstanding on account of Reimbursable Expenses.  The Debtors request authority to continue to pay the Reimbursable Expenses to its Employees, including any such amounts that may be deemed to have arisen pre-petition.

**F.    Debtors' Emergency Motion for Authorization to Use Cash Collateral pursuant to 11 U.S.C. §§ 361, 363 and 506(c).**

90.    As noted above, the Bank Group asserts liens on all or substantially all of the Debtors' assets, including the Debtors' cash.  One of the Debtors' pressing concerns is the need for the immediate use of cash subject to the Bank Group's liens (the "Cash Collateral"). The Debtors require the use of Cash Collateral in order to meet their expenses and maintain the operation of their business. Without the use of Cash Collateral, the Debtors' operations will be substantially and irreparably harmed, and the continued successful operation of the Debtors' business is essential to their operation during this case.  In order to avoid immediate and irreparable harm to the Debtors' estates, the Debtors require the use of Cash Collateral to pay, among other things, payroll, utilities, taxes, insurance, post-petition vendors and other ordinary business costs and expenses.

91.    Accordingly, the Debtors request authority to utilize cash collateral generated by the Debtors' businesses (the "Cash Collateral Motion") pursuant to a budget setting forth their anticipated receipts and disbursements during the initial phase of these Chapter 11 Cases, which will be provided prior to the interim hearing.

92.    As adequate protection for any interest in Cash Collateral which the Bank Group may have, the Debtors are willing to grant the Bank Group replacement liens in the Debtors' post-petition Cash Collateral, to the same extent, priority and validity as its pre-petition liens. The proposed replacement liens should provide sufficient adequate protection to prevent any

diminution in value to the collateral. Moreover, as noted in the Cash Collateral Motion, the Bank Group enjoys a substantial equity cushion for its over-secured claim.

93.     Finally, in order to avoid immediate and irreparable harm caused by the inability to utilize Cash Collateral, the Debtors further request that the Court schedule an interim hearing on the Cash Collateral Motion.

**G.   Debtors' Motion for Entry of Order (I) Authorizing Continued Use of Existing Cash Management System and Maintenance of Existing Bank Accounts, (II) Authorizing Continued Use of Existing Business Forms and Checks and (III) Granting Related Relief.**

94.     The Debtors also have requested authority to continue to use certain pre-petition bank accounts, check stock, and existing business forms as described below (the "Cash Management Motion"). To service their operations, the Debtors have a comprehensive cash management system in place, which is reviewed and monitored by the Debtors' internal accounting staff. If the Debtors were required to close existing bank accounts and open new accounts, there would likely be a meaningful disruption in the Debtors' ability to collect and disburse funds in the ordinary course of their operations. As explained below, the Debtors use a centralized cash management system (the "Cash Management System") to collect and transfer funds, and pay expenses.

95.     **Cash Management System.** Each of the Debtors maintains its own centralized cash management system for all of its business operations, as described herein (the Debtors' systems together, the "Cash Management System"). Overall, the Cash Management System is comprised of integrated, centralized networks of bank accounts at several domestic, financially stable, FDIC-insured banks, and it facilitates the timely and efficient collection, concentration, management, and disbursement of funds used by the Debtors.

33

96.     All together the Debtors have twenty-one bank accounts, ten of which are with Truist Bank (successor by merger to Branch Bank and Trust Company) ("Truist"), which is also the Administrative Agent under the Debtors' Credit Agreement.

97.     Exhibit A attached to the Cash Management Motion is an accurate list of bank accounts.

98.     The Cooperative has five separate accounts, all with Truist.  Account 8253 is the Cooperative's main operating account, and most of its disbursements, including ACH pulls and checks, are made from the account.  This account usually has a balance of approximately $100,000.  Account 8334 is the account to which most deposits are made.  This account sweeps daily into Account 8971, which is the Cooperative's collateral concentration account.  The collateral concentration account houses most of the Cooperative's cash position, and usually has a balance of several million dollars.  Account 9930 is the Cooperative's so-called "redemption account," and holds funds representing members' $5 membership fees, and disburses redemption payments to members upon request.  This account holds approximately $24,000.  Finally, Account 8326 is a "seasonal" account, which the Cooperative uses to make certain payments to farmers.  This account holds a balance of approximately $100,000.

99.     US Flue-Cured has three separate accounts, two with Truist and one with U.S. Bank.  Account 1361 is US Flue-Cured's primary depository and holding account.  Funds cannot be disbursed from this account.  This account sweeps daily to Account 8261, which is US Flue-Cured's operating account.  On average, the operating account holds approximately $2.5 to $3 million.  Finally, Account 1372 (at U.S. Bank) is a special purpose account set up pursuant to the terms of a certain Master Settlement Agreement (the "MSA") between certain tobacco product manufacturers and certain U.S. States and territories, to which US Flue-Cured is a signatory as a

"Subsequent Participating Manufacturer" (as defined in the MSA).[3]  US Flue-Cured holds certain funds in escrow in this account for ultimate disbursal to certain states and territories pursuant to the MSA.  The balance in this account is approximately $196,000.  Pursuant to the MSA, the beneficiaries draw approximately $4,000 per year from this account.

100.    Premier has two separate accounts, both with Fifth Third Bank.  Account 1670 is Premier Manufacturing's operating account, from which all disbursements are made, with the temporary exception of payroll.  Account 1688 is its depository account, which sweeps to the operating account. In addition, Premier Manufacturing has two "legacy" accounts with First Horizon Bank, which they anticipate closing in the near future.  First, Account 1413 at First Horizon was once Premier Manufacturing's operating account, and is still the account from which payroll is disbursed.  Premier Manufacturing anticipates that it will soon transfer payroll to its general operating account at Fifth Third Bank (i.e. Account 1670).  Premier's other "legacy" account at First Horizon is Account 1490, which was once its depository account.  Premier Manufacturing believes that some of its customers may inadvertently transmit funds to this account following the Petition Date.  Accordingly, Premier Manufacturing intends to maintain this account for a reasonable period of time into the future, and transfer any funds deposited in this account to its operating account at Fifth Third Bank.

101.    Franchise Wholesale has a similar pair of accounts with Fifth Third Bank, as well as a similar pair of "legacy" accounts at First Horizon.  Account 1696 at Fifth Third is Franchise Wholesale's operating account, from which all disbursements are made, and  with the temporary exception of payroll.  Account 1704 at Fifth Third is its depository account, which sweeps into the

---

[3] Debtors Premier Manufacturing, Inc. and King Maker Marketing, Inc. are also signatories to the MSA as "Subsequent Participating Manufacturer."  Neither of these two Debtors has a dedicated bank account for holding funds for payment pursuant to the MSA.

operating account.  Account 1602 at First Horizon is Franchise Wholesale's "legacy" operating account from which payroll is still being made.  Account 1693 at First Horizon is Franchise Wholesale's "legacy" depository account.  Like Premier Manufacturing, Franchise Wholesale will soon transfer payroll to its operating account at Fifth Third (i.e. Account 1696), and wants to maintain its "legacy" operating account following the Petition Date for a reasonable time.  Franchise Wholesale anticipates closing both "legacy" accounts in the near future.

102.    Big South also has a similar has pair of accounts, both at Truist.  Account 8313 is Big South's operating account, and Account 1388 is its depository account, which sweeps into the operating account.

103.    Finally, King Maker has only one account – Account 3344 at Truist, which serves all of King Maker's needs alone.

104.    In addition to the Bank Accounts and systems described above, the Debtors' Cash Management System includes certain company credit cards (together, the "Company Cards").  The Company Cards include Visa Purchasing Cards (so-called "P-Cards") issued by First Horizon Bank.  Employees use these cards to make purchases for the business, and First Horizon bills the Debtors directly for these charges.  The Debtors have six separate "P-Card" accounts with First Horizon Bank – one for Big South, one for Franchise Wholesale, one for Premier Manufacturing, one for US Flue-Cured, and two for the Cooperative.  Each Debtor pays its own charges.  First Horizon charges the Debtors a monthly administrative fee.

105.    The Company Cards also include Wex Enterprise ExxonMobil Cards, (so-called "Gas Cards"), issued by Wex Bank, which the Debtors issue to those of their Employees who have been provided company vehicles, and to the drivers of delivery vehicles, and which Employees can use to purchase gasoline while driving on company business.  As with the P-Cards, Wex Bank

bills the Debtors directly for charges made on the Gas Cards.[4]  Wex Bank charges the Debtors a monthly administrative fee.

106.    As well as transactions using "physical" cards, US-Flue Cured also pays vendors electronically via First Horizon's website in the ordinary course of its business.

107.    The Cooperative has one account associated with all of its employee-issued P-Cards, and one account that its accounts-payable department uses to pay invoices.  Both accounts are included in the scope of the Debtors' ordinary pre-petition practices with respect to their P-Cards, and their Company Card program for purposes of this Motion.

108.    By the Cash Management Motion, the Debtors request authority to continue their pre-petition practices with respect to the Company Cards.  The Debtors also request authority to pay the monthly administrative fees charges by First Horizon Bank and Wex Bank in connection with their administration of the Company Cards, including without limitation any portion that may have accrued pre-petition, in order to ensure that their ability to use the Company Cards continues uninterrupted.[5]  If the Debtors continue to use the Company Cards post-petition, they will ensure that they do not pay any pre-petition charges unless the Court has authorized them to do so.

109.    The Debtors' Cash Management System is essential to their ability to conduct their business operations.  It provides a customized mechanism that allows the Debtors to transfer funds quickly and efficiently as needed, and provides numerous important benefits, including allowing the Debtors to: (i) control and monitor corporate funds; (ii) ensure cash availability; (iii) reduce administrative expenses; and (iv) ensure timely and accurate balance and presentment information.

---

[4] Wex Bank bills the Cooperative for all charges made on the Gas Cards, regardless of which Debtor's Employees made the charges.  The Cooperative pays the bill in full, and the Debtors then perform an internal accounting reconciliation.

[5] The Debtors recognize that they cannot compel First Horizon and Wex Bank to continue performing under their present arrangements.  The Debtors request to continue their Company Card programs is contingent upon First Horizon and/or Wex Bank agreeing to continue to participate.

110.    The Debtors' Cash Management System is essential to their ability to conduct their business operations.  It provides a customized mechanism that allows the Debtors to transfer funds quickly and efficiently as needed, and provides numerous important benefits, including allowing the Debtors to: (i) control and monitor corporate funds; (ii) ensure cash availability; (iii) reduce administrative expenses; and (iv) ensure timely and accurate balance and presentment information.

111.    **Intercompany Transfers.**  In addition, in the ordinary course of business, the Debtors engage in various transactions amongst themselves (the "Intercompany Transactions"), pursuant to which one Debtor will incur and pay charges attributable to one or more other Debtors. The Debtors typically account for Intercompany Transactions this sort of transaction by performing an internal true-up to reconcile their ledgers, and no actual transfer of funds between the Debtors occurs.  In addition, certain of the Debtors transfer funds to one another in the ordinary course of their business, on account of ordinary-course business transactions.

112.    **Existing Business Forms and Checks.**  As part of their Cash Management System, the Debtors maintain their prepetition Bank Accounts and utilize numerous preprinted business forms (the "Business Forms") in the ordinary course of business.  The Debtors also maintain books and records to document, among other things, their profits and expenses (collectively, the "Books & Records").  To minimize expenses to the Debtors' estates and to avoid confusion on the part of employees, customers and suppliers, the Debtors request that the Court authorize them to continue to use all Business Forms (including, without limitation, checks, letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence) as such Business Forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors in possession – rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms.

**H. Debtor's Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers, and to Continue Certain Customer Programs.**

113.    The Debtors seek an order authorizing them to honor or pay certain pre- petition obligations to their customers in the ordinary course of business (the "Customer Programs Motion").

114.    At present, the Debtors have three sets of coupons in circulation (the "Prepetition Coupons"), all issued by Premier: (i) coupons for $1 off "Manitou" brand cigarettes; (ii) coupons for $1 off "1839" and "Wildhorse" brand pipe tobacco; and (iii) coupons for $1 off "1839," "Wildhorse," and "Traffic" brand pipe tobacco.  Based on the numbers of Prepetition Coupons presently in circulation, the Debtors calculate their maximum potential liability as of the Petition date under each set at: (i) $124.00; (ii) $25,334.00; and (iii) $23,287.50.

115.    Issuing coupons such as these is common in the marketplace, and is an essential component of many tobacco companies' marketing plans.  Customer confidence and goodwill, and the Debtors' ability to be remain competitive, would be severely harmed, and the Debtors' revenues would decline as a result, if the Debtors were unable to honor the Prepetition Coupons. In addition, the Debtors believe that continuing their Customer Programs in general on a post-petition basis will contribute to additional sales, as customers redeeming coupons often go on to make additional purchases of the Debtors' products, and will allow the Debtors to effectively compete in a marketplace where such programs are common.

116.    The Debtors wish to continue the Customer Programs post-petition in the ordinary course of their business.  Such relief is necessary to preserve the Debtors' critical customer relationships and goodwill, for the benefit of the estates.

**I.**  **Debtor's Application for Approval of Officer and Director Compensation.**

117.   The Debtors seek Court approval to compensate certain of the Debtors' officers (the "Officers") and directors (the "Directors") in accordance with their pre-petition compensation arrangements.  Each Officer and Director holds a critical operational, leadership and/or corporate management position within the Debtors' businesses.  The Officers and Directors are responsible for, among other things, essential day-to-day and strategic business functions, formulating and executing the Debtors' business plans, leading and providing strategic direction to the Debtors' employees, implementing the operational goals of the Debtors' Chapter 11 Cases, maintaining the Debtors' books and records, assisting the Debtors' bankruptcy counsel in preparing essential reporting documents, and providing critical strategic and operational leadership in positioning the companies for restructuring.  Given their essential roles in the Debtors' businesses, the Officers and Directors are vital to the Debtors' reorganization efforts.  Accordingly, I believe the Court should authorize and approve the requested compensation.

**J.**  **Motion to Establish Limited Notice.**

118.   The Debtors seek entry of an order limiting notices to be provided in these Chapter 11 Cases.  As a result of the significant number of creditors and parties-in-interest in these cases, copying, postage, and other expenses associated with mailing of notices as required by the Bankruptcy Code and Bankruptcy Rules would be impractical and would impose an administrative and economic burden on the Estates.  The limited notice proposed by the Debtors is in the best interest of the Debtors' Estates as it will save time and expenses associated with giving notice of all matters to every creditor and other parties-in-interest, while preserving the right to receive notice for any party who wishes to receive notices (by filing an appropriate request therefor), and will not otherwise prejudice the right of any creditor or party in interest.

40

**K.  Application of the Debtors pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014(a) for an Order Authorizing the Employment and Retention of Cozen O'Connor as Bankruptcy Counsel for the Debtors.**

119.     The Debtors seek to employ and retain Cozen O'Connor ("Cozen") as their principal bankruptcy counsel to represent them as debtors in possession in these bankruptcy cases effective as of the Petition Date.  Accordingly, the Debtors have filed an application for entry of an order authorizing them to employ and retain Cozen as their attorneys to perform the necessary legal services during these Chapter 11 Cases (the "Cozen Application").

120.     The Debtors have selected Cozen because this case is likely to be complex and will require counsel to the Debtors with extensive experience in chapter 11, restructuring and bankruptcy litigation. Cozen has extensive experience and knowledge in the field of reorganization, restructuring, debtors' and creditors' rights, business reorganizations under chapter 11 of the Bankruptcy Code and attendant litigation.  In addition, Cozen has worked with the Debtors pre-petition and become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these Chapter 11 Cases.  I believe that Cozen is both well-qualified and able to assist the Debtors in these Chapter 11 Cases, and that the firm's retention is in the best interests of the Debtors' estates and their creditors.

**L.  Application for Employment of Co-Counsel for the Debtors**

121.     The Debtors require counsel in these Chapter 11 Cases to advise on issues pertaining to, among other things, practice before this Court and North Carolina law.  Accordingly, the Debtors have filed an application to employ the law firm Hendren Redwine & Malone, PLLC ("Hendren Malone") as co-counsel in these Chapter 11 Cases.  The attorneys are Hendren Malone are well-qualified to represent the Debtors in these Chapter 11 Cases.  Based in Raleigh, North Carolina, the attorneys at Hendren Malone regularly represent debtors, creditor and trustees in

bankruptcy cases before this Court.  Moreover, the attorneys at Hendren Malone have extensive experience in chapter 11, financial restructuring and attendant litigation.  Accordingly, I respectfully submit that the Debtors' retention of Hendren Malone is in the best interests of the Debtors' estates and their creditors.

**M. The First Day Motions.**

122.    As discussed above, I am familiar with the various types of relief requested in the Debtors' First Day Motions and, for the reasons set forth above, I believe that the relief requested in the First Day Motions is in the best interest of the Debtors and their creditors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 7th day of July, 2021.

/s/ Keith H. Merrick
Keith H. Merrick
Chief Financial Officer

Exhibit A





Exhibit B

**OFFICER and Director LISTING – FY2022**

**U.S. Tobacco Cooperative Inc. – Board of Directors**

| Board of Directors | |
|---|---|
| | Danny P. Watkins, Jr., Chairman |
| | Carlos M. Vickers |
| | James T. Hill, Jr. |
| | P. Jart Hudson |
| | Cliff L. Keel |
| | Charlie S. Batten |
| | Tommy S. Kimbro |
| | Lindsey T. Warren |
| | Johnny M. Shelley |

**U.S. Tobacco Cooperative Inc. – Officers**

| Officer | |
|---|---|
| Chief Executive Officer and President | Oscar J. House, III |
| Chief Financial Officer | Keith H. Merrick |
| Senior Vice President | W. Michael Lynch |
| Senior Vice President | Russell G. Mancuso |
| Vice President | Fred C. McClintock |
| Secretary | Keith H. Merrick |
| Treasurer | Keith H. Merrick |

**U.S. Flue Cured Tobacco Growers, Inc. – Board of Directors**

| Board of Directors | |
|---|---|
| | Danny P. Watkins, Jr., Chairman |
| | Carlos M. Vickers |
| | James T. Hill, Jr. |
| | P. Jart Hudson |
| | Cliff L. Keel |
| | Charlie S. Batten |
| | Tommy S. Kimbro |
| | Lindsey T. Warren |
| | Johnny M. Shelley |

**U.S. Flue Cured Tobacco Growers, Inc. – Officers**

| Officer | |
|---|---|
| President | Oscar J. House III |
| Senior Vice President | Oscar J. House III |
| Secretary | Keith H. Merrick |
| Treasurer | Keith H. Merrick |

**Big South Distribution, LLC – Managers**

| Board of Directors | |
|---|---|
| | Danny P. Watkins, Jr., Chairman |
| | Carlos M. Vickers |
| | James T. Hill, Jr. |
| | P. Jart Hudson |
| | Cliff L. Keel |
| | Charlie S. Batten |
| | Tommy S. Kimbro |
| | Lindsey T. Warren |
| | Johnny M. Shelley |

**Big South Distribution, LLC – Officers**

| Officer | |
|---|---|
| President | Oscar J. House III |
| Senior Vice President | Russell G. Mancuso |
| Vice President | Keith H. Merrick |
| Treasurer | Todd B. Compton |
| Secretary | Keith H. Merrick |

**Premier Manufacturing, Inc. – Board of Directors**

| Board of Directors | |
|---|---|
| | Danny P. Watkins, Jr., Chairman |
| | Carlos M. Vickers |
| | James T. Hill, Jr. |
| | P. Jart Hudson |
| | Cliff L. Keel |
| | Charlie S. Batten |
| | Tommy S. Kimbro |
| | Lindsey T. Warren |
| | Johnny M. Shelley |

**Premier Manufacturing, Inc. – Officers**

| Officer | |
|---|---|
| Chief Executive Officer | Oscar J. House, III |
| Senior Vice President | Russell G. Mancuso |
| Vice President | Keith H. Merrick |
| Secretary | Keith H. Merrick |
| Treasurer | Todd B. Compton |
| Assistant Treasurer | Timothy C. Lynch |

**King Maker Marketing, Inc. – Board of Directors**

| Board of Directors | |
|---|---|
| | Danny P. Watkins, Jr. |
| | Carlos M. Vickers |
| | James T. Hill, Jr. |
| | P. Jart Hudson |
| | Cliff L. Keel |
| | Charlie S. Batten |
| | Tommy S. Kimbro |
| | Oscar J. House, III |
| | Keith H. Merrick |

**King Maker Marking, Inc. – Officers**

| Officer | |
|---|---|
| President | Oscar J. House III |
| Vice President | Keith H. Merrick |
| Senior Vice President | Russ Mancuso |
| Secretary | Keith H. Merrick |
| Treasurer | Todd B. Compton |

**Franchise Wholesale Co., L.L.C. – Managers**

| Board of Directors | |
|---|---|
| | Danny P. Watkins, Jr., Chairman |
| | Carlos M. Vickers |
| | James T. Hill, Jr. |
| | P. Jart Hudson |
| | Cliff L. Keel |
| | Charlie S. Batten |
| | Tommy S. Kimbro |
| | Lindsey T. Warren |
| | Johnny M. Shelley |

**Franchise Wholesale Co., L.L.C. – Officers**

| Officer | |
|---|---|
| Chief Executive Officer | Oscar J. House, III |
| Senior Vice President | Russell G. Mancuso |
| Vice President | Keith H. Merrick |
| Treasurer | Todd B. Compton |
| Secretary | Keith H. Merrick |
| General Manager | Daniel J. Vacek |
| Assistant Treasurer | Timothy C. Lynch |