**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| U.S. Tobacco Cooperative Inc., *et al.*[1] | ) | Case No. 21-01511-5-JNC |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**APPLICATION OF THE DEBTORS PURSUANT TO SECTIONS 327(a) AND 328(a) OF
THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE
2014 TO RETAIN SSG ADVISORS, LLC AS INVESTMENT BANKER
<u>EFFECTIVE AS OF AUGUST 2, 2021</u>**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"),

pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

respectfully submit this application (the "<u>Application</u>") for entry of an order authorizing the

Debtors to retain and employ SSG Advisors, LLC ("<u>SSG</u>") as their investment banker in

connection with the above-captioned chapter 11 cases effective as of August 2, 2021, pursuant to

the terms of the engagement agreement attached hereto as ***Exhibit A*** (the "<u>Engagement</u>

<u>Agreement</u>") and incorporated by reference herein.  The Debtors submit this Application in

reliance upon the Declaration of J. Scott Victor, attached hereto as ***Exhibit B*** (the "<u>Victor</u>

<u>Declaration</u>") and incorporated by reference herein.

In support of this Application, the Debtors respectfully state as follows:

---

[1] The Debtors in these Chapter 11 Cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): U.S. Tobacco Cooperative Inc. (4598); U.S. Flue-Cured Tobacco Growers, Inc. (9823); Premier Manufacturing, Inc. (3251); Franchise Wholesale Co., L.L.C. (7518); Big South Distribution, LLC (4164); and King Maker Marketing, Inc. (4533).  The Debtors' corporate headquarters are located at 1304 Annapolis Drive, Raleigh, NC  27608.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief requested herein are sections 327 and 328 of the Bankruptcy Code and Bankruptcy Rule 2014.

## BACKGROUND

3.      On July 7, 2021 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (the "Chapter 11 Cases").  The Debtors remain in possession of their property and continue in the operation and management of their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      The Debtors are a cooperative owned by over 500 different tobacco grower-members located in the Southeastern region of the United States.  The Debtors purchase leaf tobacco from their grower-members and process, distribute and sell tobacco products to both domestic and international markets.

5.      Additional information about the Debtors' business, capital structure and the events leading up to the Petition Date are set forth in the *Declaration of Keith H. Merrick in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* [Dkt. No. 46] (the "Merrick Declaration"),[2] which is incorporated herein by reference.

---

[2] Capitalized terms used but not defined herein shall have the meanings provided to them in the Merrick Declaration.

**RELIEF REQUESTED**

6.      Pursuant to section 327(a) and 328(a) of the Bankruptcy Code, the Debtors seek to employ and retain SSG as their investment banker in connection with the Chapter 11 Cases, effective as of August 2, 2021, when SSG professionals first began rendering services to the Debtors.

**SSG'S QUALIFICATIONS**

7.      The Debtors have determined, in the exercise of their business judgment, that the challenges they face require them to employ an investment banker to advise them with respect to their financing options in connection with these Chapter 11 Cases. The Debtors believe that SSG is well qualified to provide its services to the Debtors in a cost-effective, efficient, and timely manner. SSG will coordinate with the Debtors' other retained professionals in these Chapter 11 Cases to eliminate unnecessary duplication or overlap of work.

8.      SSG is well suited to provide the investment banking services that the Debtors require in these Chapter 11 Cases. SSG is a nationally recognized investment bank that helps middle market companies, as well as their stakeholders, complete challenging financial transactions. SSG has (a) substantial experience with, and knowledge of, companies involved in the same or similar industries as the Debtors, (b) extensive knowledge of potential lenders in the Debtors' industry, and (c) substantial special situation investment banking experience.

9.      Since 2001, SSG has completed over three hundred and fifty (350) investment banking assignments around the country and in Europe. SSG has served as an investment banker for debtors in over 150 chapter 11 proceedings. *See*, *e.g.*, *In re Avadim Health, Inc.,* Case No. 21-10883 (CTG) (Bankr. D. Del. 2021); *In re Connections Community Support Programs, Inc.,* Case No. 21-10723 (MFW) (Bankr. D. Del. 2021); *In re Paper Source, Inc. Case No. 21-30660 (KLP)*

*(Bankr. ED. Va. 2021); TPS Holdings, LLC,* Case No. 20-40743 (CJP) (Bankr. D. Mass. 2020); *In re Metal Partners Rebar,* Case No. BK-20-12878 (ABL) (Bankr. D. Nev. 2020); *In re Rubie's Costume Co., Inc.,* Case No. 20-71879 (Bankr. E.D.N.Y. 2020); *In re Mairec Industries,* Case No. 19-01198-hb (Bankr. D. S.C 2019); *In re Samuel Jewelers, Inc.,* Case No. 18-11818 (KJC) (Bankr. D. Del. 2018); *In re ABT Molecular Imaging, Inc.,* Case No. 18-11398 (CSS) (Bankr. D. Del. 2018); *In re Nighthawk Royalties, LLC,* Case No. 18-10989 (BLS) (Bankr. D. Del. 2018); *In re Vitamin World, Inc.,* Case No. 17-11933 (KJC) (Bankr. D. Del. 2017); *In re Peekay Acquisition, LLC,* Case No. 17-11722 (BLS) (Bankr. D. Del. 2017); *In re Short Bark Indus., Inc.,* Case No. 17-11502 (KG) (Bankr. D. Del. 2017); *In re Unilife Corp.,* Case No. 17-10805 (LSS) (Bankr. D. Del. 2017); *In re Verengo, Inc.,* Case No. 16-12098 (BLS) (Bankr. D. Del. 2016); *In re Canal Asphalt, Inc.,* Case No. 15-23094 (RDD) (Bankr. S.D.N.Y. 2015); *In re Corporate Resource Servs., Inc.,* Case No. 15-12329 (MG) (Bankr. S.D.N.Y. 2015); *In re DNL Indus., LLC,* Case No. 13-22079 (RDD) (Bankr. S.D.N.Y. 2013); *In re Journal Register Co.,* Case No. 12-13774 (SMB) (Bankr. S.D.N.Y. 2012), and many others.

10.     The Debtors, in the exercise of their business judgment, have selected SSG as their investment banker based upon, inter alia, (a) the Debtors' need to retain an investment banking firm to provide advice with respect to their financing options, and (b) SSG's extensive experience and excellent reputation in providing investment banking services in chapter 11 bankruptcy cases.

## SERVICES TO BE PROVIDED

11.     Subject to Court approval, and as more fully described in the Engagement Agreement, the services being provided by SSG during these Chapter 11 Cases include investment banking services in connection with the private placement of debt capital through debtor in

possession ("DIP") financing and/or exit financing (together, the "Financing").  Such services may include, *inter alia*:

    a. Preparing an information memorandum describing the Cooperative, its historical performance and prospects, including existing contracts, marketing and sales, labor force, management, and financial projections;

    b. Assisting the Debtors in compiling a data room of any necessary and appropriate documents related to the Financing;

    c. Assisting the Debtors develop a list of suitable potential lenders who will be contacted on a discreet and confidential basis after approval by the Debtors;

    d. Coordinating the execution of confidentiality agreements for potential lenders and investors wishing to review the information memorandum;

    e. Assisting the Debtors in coordinating physical and/or virtual site visits for interested lenders and work with the management team to develop appropriate presentations for such visits;

    f. Soliciting competitive offers from potential lenders;

    g. Advising and assisting the Debtors in structuring the Financing and negotiating the Financing agreements;

    h. Providing testimony in support of such Financing; and

    i. Otherwise assisting the Debtors and its other professionals, as necessary, through closing on a best efforts basis.

12.    It is necessary for the reorganization efforts of the Debtors that the Debtors employ SSG to render the foregoing professional services. The Debtors believe that the services will not duplicate the services that the Debtors' other professionals will be providing in these Chapter 11 Cases. Specifically, SSG will carry out unique functions and will use reasonable efforts to

coordinate with the Debtors and their other professionals to avoid the unnecessary duplication of services.

## PROFESSIONAL COMPENSATION

13.     As more fully described in the Engagement Agreement, in consideration of the services provided by SSG, the Debtors have agreed to pay SSG as follows:

a.  **Initial Fee.** An initial fee (the "Initial Fee") equal to $40,000 due upon signing this Engagement Agreement and subject to Bankruptcy Court approval of SSG's engagement hereunder.  Fifty percent (50%) of the Initial Fee shall be credited against a Financing Fee, as defined below.

b.  **Monthly Fees.** Monthly fees (the "Monthly Fees") of $40,000 per month payable beginning September 1, 2021 and on the first (1st) of each month thereafter throughout the Engagement Term (as such term is defined in the Engagement Agreement).  Fifty percent (50%) of the Monthly Fees shall be credited against a Financing Fee.

c.  **Financing Fee.**  Upon the closing of a Financing Transaction (as defined in the Engagement Agreement) to any party, except as set for the below, SSG shall be entitled to a fee ("Financing Fee") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Financing equal to 1.5% of any Senior Debt (as such term is defined in the Engagement Agreement) raised from any financing source, including senior revolver and term loan, plus 3.0% of any Tranche B, Traditional Subordinated Debt or Equity (as defined in the Engagement Agreement) raised regardless of whether the Company chose to draw down the full amount of the Financing.

However, in the event SSG delivers to the Debtors one or more term sheets for a Financing, including for DIP Financing and/or Exit Financing, and the existing lender group provides such DIP Financing and/or Exit Financing, then SSG's Financing Fee shall be .75% of such Financing.  In addition, in the event that the Company identifies and refers a potential lender(s) to SSG in writing prior to execution of the Engagement Agreement, and such lender(s) provide(s) DIP Financing and/or Exit Financing, then SSG's Financing Fee shall be .75% of such Financing.

d.  **Expenses**. In addition to the foregoing Initial Fee, Monthly Fee, and Financing Fee noted above whether or not a Financing Transaction is consummated, SSG will be entitled to reimbursement for all of SSG's reasonable out-of-pocket expenses

incurred in connection with the subject matter of this Engagement Agreement up to a cumulative cap of $10,000 and thereafter, upon the Debtors' approval.

14.     The Debtors believe that the compensation structure described above is (a) comparable to compensation generally charged by investment banking firms of similar stature to SSG for comparable engagements, both in and out of bankruptcy proceedings, and (b) reflects a typical fee structure for SSG and other leading investment banking firms which do not bill their clients on an hourly basis, but are generally compensated on a transactional basis.

15.     The hours worked, the results achieved, and the ultimate benefit to the Debtors of the work performed by SSG in connection with this engagement may vary and the Debtors have taken this into account in setting the above fees.

16.     SSG's restructuring expertise, as well as its capital markets knowledge, financing skills, and knowledge and experience within the Debtors' industry, some or all of which may be required by the Debtors during the term of SSG's engagement hereunder, were important factors to the Debtors in determining the amount of SSG's fees, and the Debtors believe that the ultimate benefit to the Debtors of SSG's services hereunder cannot be measured merely by reference to the number of hours to be expended by SSG's professionals in the performance of such services.

## MODIFICATION OF COMPLIANCE WITH REQUIREMENTS REGARDING TIME ENTRY DETAIL

17.     Consistent with its ordinary practice and the practice of investment bankers and financial advisors in other chapter 11 cases whose fee arrangements are typically not hours-based, SSG does not ordinarily maintain contemporaneous time records in one-tenth hour (0.10) increments (similar to those customarily kept by attorneys) or provide or conform to a schedule of hourly rates for its professionals. Accordingly, SSG requests that it be excused from such timekeeping and information requirements. SSG will maintain records in support of any actual,

necessary costs and expenses incurred in connection with the rendering of its services in these cases.

## SSG'S DISINTERESTEDNESS

18.    To the best of the Debtors' knowledge, (a) SSG is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and, as required by section 327(a) and referenced by section 328(c) of the Bankruptcy Code, neither holds nor represents any interest adverse to the Debtors and their estates, and (b) except as disclosed in the Victor Declaration, has no connection to the Debtors or to their significant creditors or certain other potential parties-in-interest ("Parties-in-Interest") whose names were supplied to SSG by the Debtors.[3]

19.    Also, to the best of the Debtors' knowledge, information, and belief, and based entirely and in reliance upon the Victor Declaration: (a) to the best of Mr. Victor's knowledge, information, and belief, none of SSG's past or current engagements would or does appear to create an interest materially adverse to the interests of the Debtors, creditors, or equity security holders in these Chapter 11 Cases and as such, the Debtors believe that SSG is disinterested and holds no materially adverse interest as to the matters upon which it is to be retained; and (b) to the extent SSG discovers any facts bearing on the matters described herein during the period of SSG's retention, SSG will supplement the information contained in the Victor Declaration.

20.    As described in more detail in the Victor Declaration, SSG, *inter alia,* searched its conflict databases to determine whether it represents, or has represented, certain of the Debtors' creditors or other Parties-in-Interest in these proceedings, or matters wholly unrelated to those

---

[3] The list of Parties-in-Interest supplied to SSG by the Debtors is attached as Schedule 1 to the Victor Declaration. To the extent that SSG's research of relationships with these Parties-in-Interest indicated that SSG has provided in the recent past or is currently providing services to any of these entities in matters unrelated to the Chapter 11 Cases, SSG has so indicated in Schedule 2 to the Victor Declaration.

proceedings. Due to the size of SSG and the number of creditors and other Parties-in-Interest involved in these Chapter 11 Cases, however, SSG may have represented certain of the Debtors' creditors or other Parties-in-Interest in matters wholly unrelated to the Chapter 11 Cases. Except as may be described in the Victor Declaration, SSG does not, to its knowledge, represent any party with an interest materially adverse to the Debtors or their estates.

21.     Also, in accordance with section 504 of the Bankruptcy Code, SSG has informed the Debtors that there is no agreement or understanding between SSG and any other entity, other than an employee of SSG, for the sharing of compensation received or to be received for services rendered in connection with these Chapter 11 Cases.

## **INDEMNIFICATION**

22.     As described fully in the Engagement Agreement, the Debtors have agreed (a) to indemnify, defend, and hold harmless SSG and SSG Capital Advisors, LLC ("SCA") and their affiliates, the respective partners, members, directors, officers, agents, and employees of SSG, SCA, and their affiliates and each other person, if any, controlling SSG, SCA, and their affiliates (collectively, the "Indemnified Parties") from and against any and all losses, claims, liabilities, or costs, as and when incurred, to which such Indemnified Party may become subject to or which are asserted against any Indemnified Party, directly or indirectly, in any way related to SSG acting for the Debtors under the Engagement Agreement by third parties to the Engagement Agreement, and (b) to reimburse the Indemnified Parties for any legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing, or defending any such losses, claims, damages or liabilities; provided, however, that the Debtors shall not be liable for any such liability found in a final judgment or settlement to have resulted from SSG's gross negligence, fraud, willful

misconduct, breach of fiduciary duty, bad faith or self-dealing in the performance of duties under the Engagement Agreement.

23.     Notwithstanding the foregoing, the Debtors and SSG have agreed to modify the Engagement Agreement as follows:

   a.  The Debtors shall be bound by the indemnification and other provisions of the Engagement Agreement and will indemnify the Indemnified Parties pursuant to the terms of the Engagement Agreement subject, during the pendency of these Chapter 11 Cases, to the following:

      i.  The Indemnified Parties shall not be entitled to indemnification, contribution, or reimbursement pursuant to the Engagement Agreement, unless the indemnification, contribution, or reimbursement are approved by the Court; and

      ii. If, before the entry of an order closing these chapter 11 cases, an Indemnified Party believes it is entitled to the payment of any amounts by the Debtors on account of the indemnification obligations under the Engagement Agreement, including, without limitation, the advancement of defense costs, then such Indemnified Party must file an application in this Court, and the Debtors may not pay any such amounts to such Indemnified Party before the entry of an order by this Court approving the payment. This subparagraph (ii) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by the Indemnified Parties for indemnification, contribution, or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify the Indemnified Parties. All parties in interest shall retain the right to object to any demand by the Indemnified Parties for indemnification, contribution, or reimbursement.

24.     The Debtors and SSG submit that the indemnification provisions, as modified, are customary and reasonable for investment banking engagements, both in and out-of-court. Approval of such indemnification provisions is also warranted under section 328 of the Bankruptcy Code, which allows a debtor, with the Court's approval, to employ "a professional person under

section 327…of this title…on any reasonable terms and conditions of employment." 11 U.S.C. § 328(a).

## RETENTION PURSUANT TO SECTION 328(a) OF THE BANKRUPTCY CODE

25.     Section 327(a) of the Bankruptcy Code provides that a debtor, subject to court approval, "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under this title." 11 U.S.C. § 327(a).

26.     Additionally, under section 328(a) of the Bankruptcy Code, the Debtors, "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including investment bankers, on more flexible terms that reflect the nature of their services and market conditions. As the United States Court of Appeals for the Fifth Circuit recognized in *Donaldson Lufkin & Jenrette Sec. v. Nat'l Gypsum (In re Nat'l Gypsum Co.)*:

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court

> approval of compensation agreed to with the trustee (or debtor or committee).

123 F.3d 861, 862 (5th Cir. 1997) (internal citations and emphasis omitted).

27.     Bankruptcy Rule 2014 further requires that an application for retention of a professional person include:

> [S]pecific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed R. Bank. P. 2014(a).

28.     As discussed in this Application and the Victor Declaration, SSG satisfies the disinterestedness standard in section 327(a) of the Bankruptcy Code. Additionally, given the numerous issues that SSG may be required to address in the performance of its services for the Debtors pursuant to the Engagement Agreement, SSG's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for SSG's services for engagements of this nature, the Debtors believe that the terms and conditions of the Engagement Agreement are fair, reasonable, and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

29.     Indeed, the Debtors submit that the fee structure, expense reimbursement, and indemnification provisions are reasonable terms and conditions of employment under section 328(a) of the Bankruptcy Code in light of the following: (a) the nature and scope of services to be provided by SSG; (b) industry practice with respect to the fee structures and indemnification provisions typically utilized by leading investment banks and investment bankers that do not bill

their clients on an hourly basis; (c) market rates charged for comparable services both in and out of the chapter 11 context; (d) SSG's substantial experience with respect to financial restructuring and investment banking; and (e) the nature and scope of work already performed by SSG.

30.    The terms of the Engagement Agreement were negotiated in good faith and at arm's-length between the Debtors and SSG and reflect the Debtors' evaluation of the substantial work that will be performed by SSG and its financial advisory expertise.

31.    Furthermore, the fee structure is consistent with and typical of compensation arrangements entered into by SSG and other comparable firms in connection with the rendering of similar services under similar circumstances. SSG's strategic and financial expertise as well as its capital markets knowledge, financing skills, restructuring capabilities, and mergers and acquisitions expertise, some or all of which may be required by the Debtors during the term of SSG's engagement, were all important factors in determining the fee structure. The Debtors believe that the ultimate benefit of SSG's services cannot be measured by reference to the number of hours to be expended by SSG's professionals in the performance of such services. The Debtors submit that the fee structure is both fair and reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

32.    Accordingly, by this Application, and consistent with section 328(a) of the Bankruptcy Code, the Debtors seek authority to pay SSG the Initial Fee, the Monthly Fees, the Financing Fee and the Expenses (collectively, the "SSG Fees and Expenses") as they become due under the Engagement Agreement without further order of Court.

33.    Notwithstanding approval of the Engagement Agreement under section 328(a) of the Bankruptcy Code, at the conclusion of its engagement, SSG will apply for final Court approval of the SSG Fees and Expenses.  In addition, the Debtors propose that, notwithstanding SSG's

retention under section 328(a) of the Bankruptcy Code, the Bankruptcy Administrator will retain the right to object to the compensation to be paid to SSG pursuant to the Engagement Agreement at the conclusion of SSG's retention based on the reasonableness standard provided for in section 330 of the Bankruptcy Code, provided that reasonableness for this purpose shall include, *inter alia*, an evaluation by comparing the fees payable in these Chapter 11 Cases to the fees paid to other investment banking firms for comparable services in other chapter 11 cases and outside of chapter 11 cases, and shall not be evaluated primarily on the basis of time committed or the length of these cases.

## NOTICE

34.     The Debtors have provided notice of this Application either by electronic mail, facsimile, overnight delivery or United States First Class mail to: (i) the Office of the Bankruptcy Administrator for the Eastern District of North Carolina; (ii) counsel for the Administrative Agent; and (iii) all creditors and parties-in-interest who have appeared through counsel or otherwise filed a request for notice in these Chapter 11 Cases. Due to the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors request that the Court enter an order granting the relief requested by this Application, and granting any additional relief as is just and proper.

Respectfully submitted,

Dated: August 2, 2021

**HENDREN, REDWINE & MALONE, PLLC**

/s/ Rebecca F. Redwine
Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: (919) 420-7867
Facsimile: (919) 420-0475
Email: jhendren@hendrenmalone.com
      rredwine@hendrenmalone.com
      bwaller@hendrenmalone.com

and

**COZEN O'CONNOR**

Mark E. Felger
Simon E. Fraser
1201 N. Market St., Ste. 1001
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
E-mail: mfelger@cozen.com
sfraser@cozen.com

David R. Doyle
Christina M. Sanfelippo
123 N. Wacker Drive, Ste. 1800
Chicago, IL 60606
Telephone: (312) 474-1648
Facsimile: (312) 382-8910
Email: daviddoyle@cozen.com
csanfelippo@cozen.com

*Counsel for the Debtors and*
*Debtors in Possession*





July 30, 2021

Mr. Keith H. Merrick
Chief Financial Officer
U.S. Tobacco Cooperative Inc.
1304 Annapolis Drive
Raleigh, NC  27608

Dear Mr. Merrick:

This agreement ("Engagement Agreement") will serve as the contract between U.S. Tobacco Cooperative Inc. and its affiliates and subsidiaries, Big South Distribution, LLC, Franchise Wholesale Co., LLC, King Maker Marketing, Inc., Premier Manufacturing, Inc., and U.S. Flue-Cured Tobacco Growers, Inc. (collectively "USTC" or the "Cooperative"), as debtors and debtors-in-possession in Chapter 11 proceedings in the U.S Bankruptcy Court for the Eastern District of North Carolina, Case No. 21-01511-5 (JNC) (Jointly Administered), and SSG Advisors, LLC ("SSG" or "Advisor") regarding the retention of SSG as exclusive investment banker to USTC for the purposes outlined in this Engagement Agreement.    SSG's responsibilities hereunder involve providing investment banking services to USTC, on an exclusive basis, focusing on the private placement of debt capital through debtor-in-possession ("DIP") financing and/or exit financing ("Exit Financing," the DIP and Exit Financing collectively referred to hereinafter as the "Financing").

A.    **SSG's Role**

1.    SSG's role in connection with a Financing Transaction will include the following:

- Prepare an information memorandum describing USTC, its historical performance and prospects, including existing contracts, marketing and sales, labor force, management, and financial projections;

- Assist the Cooperative in compiling a data room of any necessary and appropriate documents related to the Financing;

- Assist the Cooperative in developing a list of suitable potential lenders who will be contacted on a discreet and confidential basis after approval by the Cooperative;

- Coordinate the execution of confidentiality agreements for potential lenders and investors wishing to review the information memorandum;

- Assist the Cooperative in coordinating physical and/or virtual site visits for interested lenders and work with the management team to develop appropriate presentations for such visits;

- Solicit competitive offers from potential lenders;

Mr. Keith H. Merrick
July 30, 2021
Page 2

- Advise and assist the Cooperative in structuring the Financing and negotiating the Financing agreements;

- Provide testimony in support of such Financing; and

- Otherwise assist the Cooperative and its other professionals, as necessary, through closing on a best efforts basis.

2.     The Cooperative will furnish or cause to be furnished to SSG such information as SSG reasonably believes appropriate to the execution of its engagement hereunder (all such information so furnished being the "Information"). The Cooperative represents to SSG that all Information furnished by it or its agents will be complete and correct in all material respects, to the best of its knowledge, and that until the expiration of SSG's engagement hereunder, the Cooperative will advise SSG immediately of the occurrence of any event or any other change known by it or its agents that results in the Information ceasing to be complete and correct in all material respects. The Cooperative recognizes and confirms that SSG: (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated hereby without having independently verified any of the same; (b) does not assume responsibility for accurateness or completeness of the Information and such other information; and (c) will not make an appraisal of any of the assets or liabilities of the Cooperative.

The Cooperative agrees that SSG shall be its exclusive investment banker in connection with any Financing Transaction undertaken with respect to the Cooperative during the Engagement Term, as defined below, of this Engagement Agreement. The Cooperative agrees that, during the Engagement Term, SSG shall have the authority to initiate and conduct discussions and assist and advise the Cooperative in its negotiations with all prospective lenders. In that regard, the Cooperative agrees to identify to SSG: (a) all prospective lenders who have been in contact with the Cooperative prior to the date hereof and (b) all prospective lenders who come in contact with the Cooperative during the Engagement Term.

SSG will consult with and advise the Cooperative with respect to the financial aspects of any proposed Financing Transaction, including price, terms, and conditions of a Financing Transaction. SSG will not, however, have any authority to bind the Cooperative with respect to any proposed Financing Transaction. Likewise, nothing contained herein shall require the Cooperative to accept the terms of any proposal, and the Cooperative shall at all times have the right, in its sole and absolute discretion, to reject any proposed Financing Transaction regardless of the terms proposed.

Mr. Keith H. Merrick
July 30, 2021
Page 3

B.    **SSG's Compensation**

As compensation for providing the foregoing services, SSG shall receive the following:

1.    Initial Fee.  An initial fee (the "Initial Fee") equal to $40,000 due upon signing this Engagement Agreement and subject to Bankruptcy Court approval of SSG's engagement hereunder.  Fifty percent (50%) of the Initial Fee shall be credited against a Financing Fee, as defined below.

2.    Monthly Fees.  Monthly fees (the "Monthly Fees") of $40,000 per month payable beginning September 1, 2021 and on the first (1st) of each month thereafter throughout the Engagement Term (as such term is hereafter defined).  Fifty percent (50%) of the Monthly Fees shall be credited against a Financing Fee.

3.    Financing Fee.  Upon the closing of a Financing Transaction to any party, except as set for the below, SSG shall be entitled to a fee ("Financing Fee") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Financing equal to 1.5% of any Senior Debt (as such term is hereafter defined) raised from any financing source, including senior revolver and term loan, plus 3.0% of any Tranche B, Traditional Subordinated Debt or Equity (as such term is hereafter defined) raised regardless of whether the Cooperative chose to draw down the full amount of the Financing.

However, in the event SSG delivers to the Cooperative one or more term sheets for a Financing, including for DIP Financing and/or Exit Financing, and the existing lender group provides such DIP Financing and/or Exit Financing, then SSG's Financing Fee shall be .75% of such Financing.  In addition, in the event that the Company identifies and refers a potential lender(s) to SSG in writing prior to execution of this Engagement Agreement, and such lender(s) provide(s) DIP Financing and/or Exit Financing, then SSG's Financing Fee shall be .75% of such Financing.

4.    Expenses. In addition to the foregoing Initial Fee, Monthly Fee, and Financing Fee noted above whether or not a Financing Transaction is consummated, SSG will be entitled to reimbursement for all of SSG's reasonable out-of-pocket expenses incurred in connection with the subject matter of this Engagement Agreement up to a cumulative cap of $10,000 and thereafter, upon Cooperative approval.

C.    **Definitions**

For the purpose of this Engagement Agreement:

**Financing Transaction** means funds received by the Cooperative from any senior debt (including, but not limited to DIP Financing and/or Exit Financing), secured subordinated debt, unsecured subordinated debt or non-control equity from any lender or investor, as well as the purchase by any party of the senior debt.

**Senior Debt** means funds:  (a) received by the Cooperative in the form of DIP Financing, revolving credit facilities, notes, term loans, lines of credit, offering lines, purchase and

Mr. Keith H. Merrick
July 30, 2021
Page 4

sale of accounts receivable facilities, or any other type of credit facility, for which the Cooperative is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate, without any profit participation or yield enhancement as a return on the repayment of the funds received by the Cooperative; and (b) for which the lender has a claim to or lien on the assets of the Cooperative, superior or prior to the claim of the holders of any Tranche B or Traditional Subordinated Debt.

**Tranche B Loan** means:  (a) funds (i) received by the Cooperative or for which the Cooperative is obligated to repay the funds on a fixed schedule with interest on the unpaid balance therefore at a fixed interest rate or a floating rate higher than that of Senior Debt, and (ii) for which the lender may have a claim to or lien on the assets of the Cooperative, junior to the claim of the holders of Senior Debt.

**Traditional Subordinated Debt** means:  (a) funds (i) received by the Cooperative or for which the Cooperative is obligated to repay the funds on a fixed schedule with interest on the unpaid balance therefore at a fixed interest rate or a floating rate; and (ii) for which the lender does not have a claim to or lien on the assets of the Cooperative, or (b) funds (i) received by the Cooperative, or for which the Company is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate; and (ii) for which part of the overall return to the investor on these funds is anticipated to consist of a participation in the profits of the Company and/or some other type of income enhancement (whether realized through equity warrants conversions of the debt to equity, or otherwise) which has the effect of raising the overall return on these funds to the investors above the level that could be realized solely due to the receipt of stated interest income.

**Equity** shall include, but not be limited to, common stock, preferred stock, convertible stock, and the proceeds from any joint venture agreement, including contributions by a joint venture partner involving cash, stock, property, plant and equipment or any other assets, or asset sale that does not constitute control equity.

**Transaction** shall mean and include a Financing as defined above.

**Transaction Fee** shall mean and include a Financing Fee.

**D.**   **Term of Engagement**

This Engagement Agreement shall remain in force (the "Engagement Term") for a period of six (6) months from the date of signing this Engagement Agreement, and may continue thereafter on a month to month basis if agreed to by the parties. Upon the termination of this Engagement Agreement, neither party shall have any further obligations to the other except that:  (a) termination of the Engagement Agreement shall not affect SSG's right to indemnification under the Indemnification paragraph below; (b) the Company shall remain obligated to pay SSG any unpaid Monthly Fees and to reimburse SSG for any expenses incurred through the date of the termination of the Engagement Agreement; and (c) if a Financing is consummated within twelve (12) months ("Trailer Term") of the termination of this Engagement Agreement with a lender contacted by SSG, the Company shall remain obligated to pay a Financing Fee  as calculated above. Sections B, D, E, F and G (entitled

Mr. Keith H. Merrick
July 30, 2021
Page 5

Compensation, Term of Engagement, Indemnification, Miscellaneous, and Scope of SSG's Duties, respectively) of this Engagement Agreement shall survive the expiration or termination of this Engagement Agreement indefinitely.

**E.**     **Indemnification**

The Company hereby acknowledges and agrees to the indemnification arrangements between the parties hereto as described on Attachment A hereto, which Attachment is incorporated herein and forms an integral part hereof.

**F.**     **Miscellaneous**

No fee payable to any financial advisor or finder by the Company in connection with the subject matter of this Engagement Agreement shall reduce or otherwise affect any fee payable to SSG hereunder without the prior written consent of SSG. This Engagement Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto. This Engagement Agreement cannot be modified or changed, nor can any of its provisions be waived, except by (a) written agreement signed by both parties, (b) pursuant to the Company's application to the Bankruptcy Court seeking retention of SSG and approval of this Engagement Agreement or (c) pursuant to the order by the Bankruptcy Court granting such application or other order by the Bankruptcy Court. The benefits of this Engagement Agreement shall inure to the respective successors and assigns of the parties hereto and of the Indemnified Parties and their respective successors, assigns and representatives, and the obligations and liabilities assumed in this Engagement Agreement by the parties hereto shall be binding upon their respective successors and assigns.

This Engagement Agreement may be executed in any number of counterparts, which counterparts, taken together, shall constitute one and the same Engagement Agreement.

**G.**     **Scope of Duties**

The Company hereby acknowledges and agrees that:  (a) it has retained SSG for the purposes set forth in the Engagement Agreement and that the rights and obligations of the parties hereto are contractual in nature, and (b) SSG has not made any warranties or guarantees of any nature with respect to the success or satisfactory conclusion of any Financing Transaction or as to the economic, financial or other results which may be obtained or experienced by the Company as a result thereof.

**H.**     **Bankruptcy Proceeding**

This Engagement Agreement is subject to the submission of customary retention documents and conditional upon an Order of the Bankruptcy Court approving SSG's retention under Section 328(a) of the Bankruptcy Code.

Mr. Keith H. Merrick
July 30, 2021
Page 6

### I.   Other Matters

SSG has the right, following a Financing Transaction closing and subject to USTC's approval, such approval to not be unreasonably withheld, to place advertisements in financial and other newspapers and journals and to send email advertising at its own expense describing its services to the Company hereunder.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), SSG is required to obtain, verify and record information that identifies its clients, which information may include the name and address of the Company, the Company and its senior management team as well as other information that will allow SSG to properly identify its clients. Additionally, SSG maintains important disclosures on its web site www.ssgca.com. These disclosures may be updated periodically on an as-needed basis. The Company agrees to accept and receive all of these disclosures by electronically accessing the website referenced above and acknowledges that printed hard copies of these disclosures are available upon request by contacting SSG directly at (610) 940-1094.

### J.   Securities Platform

All transactions involving the sale or purchase of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under) are offered through SSG Capital Advisors, LLC. ("SCA") which is an affiliated registered Broker-Dealer in good standing with the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC"). Principals of SSG are registered representatives of SCA. Therefore, SCA is included collectively as "SSG" with all the rights and obligations thereto under the terms of this Engagement Agreement.

To the extent a Financing Fee is payable to SSG in connection with a Financing Transaction constituting the purchase or sale of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under), such Transaction Fee shall be specifically paid to SCA.

This letter and acceptance may be executed in counterpart, each part of which shall be deemed an original, both of which together shall constitute one and the same instrument, and any amendment, modification or other changes to this Engagement Agreement must be in writing and signed by both parties to be enforceable.

Mr. Keith H. Merrick
July 30, 2021
Page 7


Please indicate your acceptance of the foregoing by executing and returning the enclosed copy of this letter.


**SSG ADVISORS, LLC**


By: _____          _____
    J. Scott Victor                                    Teresa C. Kohl
    Managing Director                             Managing Director


ACCEPTED:

**U.S. TOBACCO COOPERATIVE INC.**


By: _____          _____
    Keith H. Merrick                                Date   2 August 2021
    Chief Financial Officer

Mr. Keith H. Merrick
July 30, 2021
Page 8

## ATTACHMENT A
## INDEMNIFICATION PROVISIONS

The Company agrees to indemnify, defend and hold harmless SSG or SCA, and their affiliates, the respective partners, members, directors, officers, agents and employees of SSG, SCA, and their affiliates and each other person, if any, controlling SSG, SCA, and their affiliates (the foregoing being referred to herein individually as an "Indemnified Party" and collectively as the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities or costs, as and when incurred, to which such Indemnified Party may become subject to or which are asserted against any Indemnified Party asserted by third parties to the Engagement Agreement, directly or indirectly, in any way related to SSG performing services for or on behalf of the Company under the Engagement Agreement of which this Attachment A forms a part, including, without limitation, in connection with:  (a) any act or omission by SSG related to its engagement as investment banker under the Engagement Agreement; or (b) SSG's acceptance, or its performance or non-performance, of its obligations under said Engagement Agreement.

Notwithstanding the foregoing paragraph, the Company shall have no obligation to indemnify the Indemnified Parties, or provide contribution or reimbursement to the Indemnified Parties, for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from any of the Indemnified Parties' gross negligence, fraud, willful misconduct, breach of fiduciary duty, if any, bad faith, or self-dealing; (ii) for a contractual dispute in which the Company alleges the breach of the Indemnified Parties' contractual obligations, unless the Bankruptcy Court determines that indemnification, contribution, or reimbursement would be permissible under applicable law; or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Bankruptcy Court, after notice and a hearing, to be a claim or expense for which the Indemnified Parties should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Agreement.

The Company agrees that reliance by SSG on any publicly-available information, which SSG verifies with the Company, the information supplied by the Company to SSG in connection with said Engagement Agreement, or any directions furnished by the Company, on which SSG wholly relies, shall not constitute negligence, bad faith or willful misconduct by SSG.

The provisions of this Attachment A shall survive any termination of said Engagement Agreement.



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| U.S. Tobacco Cooperative Inc., *et al.*[1] | ) | Case No. 21-01511-5-JNC |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## DECLARATION OF J. SCOTT VICTOR

I, J. Scott Victor, declare under penalty of perjury as follows:

1.     I am a Managing Director of SSG Advisors, LLC ("SSG") and its registered broker/dealer affiliate, SSG Capital Advisors, LLC. I have over thirty-five (35) years of experience in advising businesses facing operational or financial challenges, including bankruptcy proceedings.

2.     I submit this Declaration in support of the application (the "Application")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order authorizing the employment and retention of SSG as investment banker to the Debtors effective as of August 2, 2021 pursuant to sections 327 and 328 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). I am duly authorized to submit this Declaration on behalf of SSG. Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, I could and would testify thereto.

---

[1] The Debtors in these Chapter 11 Cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): U.S. Tobacco Cooperative Inc. (4598); U.S. Flue-Cured Tobacco Growers, Inc. (9823); Premier Manufacturing, Inc. (3251); Franchise Wholesale Co., L.L.C. (7518); Big South Distribution, LLC (4164); and King Maker Marketing, Inc. (4533).  The Debtors' corporate headquarters are located at 1304 Annapolis Drive, Raleigh, NC 27608.

[2] All undefined terms in this Declaration shall carry the meanings ascribed to them in the Application.

3.      This Declaration is also submitted as the statement required pursuant to sections 328(a) and 504 of the Bankruptcy Code and Rule 2014(a) of the Bankruptcy Rules.

### DISINTERESTEDNESS

4.      To check and clear potential conflicts of interest in these Chapter 11 Cases, as well as determine all "connections" (as such term is used in Bankruptcy Rule 2014) with Parties-In-Interest, SSG conducted a review of the interested parties in these Chapter 11 Cases as provided to SSG by the Debtors and attached hereto as **Schedule 1** (collectively, the "Potential Parties-in-Interest"). To the extent that SSG's search of its relationships with the Potential Parties-in-Interest indicated that SSG currently represents, previously represented, or has a connection with any of the Potential Parties-in-Interest, the identities of such Potential Parties-in-Interest and relationship to the Debtors and connection to SSG are set forth in **Schedule 2** hereto.

5.      Except as set forth in Schedule 2, to the best of my knowledge, information, and belief after reasonable inquiry, SSG (a) does not hold or represent any interest adverse to the Debtors' estates in matters upon which is has been engaged, and (b) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code. Furthermore, except as set forth in Schedule 2, to the best of my knowledge, information, and belief after reasonable inquiry, neither I nor SSG, nor any member or employee thereof, has any connections with the Debtors, their creditors, any Parties-in-Interest, their respective attorneys and accountants, or any attorney employed in the Office of the Bankruptcy Administrator for this district.

6.      As part of its diverse practice, SSG has appeared in numerous cases, proceedings, and transactions that involve may different professionals, including attorneys, accountants, and financial consultants, who may represent claimants and Parties-in-Interest in these Chapter 11 Cases. Also, SSG has performed in the past, and may perform in the future, investment banking

and financial consulting services for various attorneys and law firms, lenders, and creditors, some of whom may be involved in these proceedings. In addition, SSG has in the past and will likely in the future be working with or against other professional involved in these Chapter 11 Cases in matters unrelated to the Debtors and these Chapter 11 Cases. Based on my current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which SSG is to be employed, and none are in connection with the Chapter 11 Cases.

7.      Accordingly, I believe that SSG is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code.

8.      To the extent that SSG discovers any facts or additional information during the period of SSG's retention that requires disclosure, SSG will supplement this Declaration to disclose such information.

## PROFESSIONAL COMPENSATION

9.      Subject to the Court's approval, the Debtors have agreed to pay SSG during the Chapter 11 Cases pursuant to the terms in the Engagement Agreement, which are summarized as follows:

a.  **Initial Fee.**  An initial fee (the "Initial Fee") equal to $40,000 due upon signing this Engagement Agreement and subject to Bankruptcy Court approval of SSG's engagement hereunder.  Fifty percent (50%) of the Initial Fee shall be credited against a Financing Fee, as defined below.

b.  **Monthly Fees.**  Monthly fees (the "Monthly Fees") of $40,000 per month payable beginning September 1, 2021 and on the first (1st) day of each month thereafter throughout the Engagement Term (as such term is defined in the Engagement Agreement).  Fifty percent (50%) of the Monthly Fees shall be credited against a Financing Fee.

c.  **Financing Fee.**  Upon the closing of a Financing Transaction to any party, except as set for the below, SSG shall be entitled to a fee ("Financing Fee") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of

3

closing of such Financing equal to 1.5% of any Senior Debt (as such term is hereafter defined) raised from any financing source, including senior revolver and term loan, plus 3.0% of any Tranche B, Traditional Subordinated Debt or Equity (as such term is defined in the Engagement Agreement) raised regardless of whether the Company chose to draw down the full amount of the Financing.

However, in the event SSG delivers to the Debtors one or more term sheets for a Financing, including for DIP Financing and/or Exit Financing, and the existing lender group provides such DIP Financing and/or Exit Financing, then SSG's Financing Fee shall be .75% of such Financing. In addition, in the event that the Company identifies and refers a potential lender(s) to SSG in writing prior to execution of this Engagement Agreement, and such lender(s) provide(s) DIP Financing and/or Exit Financing, then SSG's Financing Fee shall be .75% of such Financing.

d. **Expenses**. In addition to the foregoing Initial Fee, Monthly Fee, and Financing Fee noted above whether or not a Financing Transaction is consummated, SSG will be entitled to reimbursement for all of SSG's reasonable out-of-pocket expenses incurred in connection with the subject matter of this Engagement Agreement up to a cumulative cap of $10,000 and thereafter, upon the Debtors' approval.

10.     This compensation structure is typical of SSG's fee arrangement (as well as those of other leading investment banking firms) for work of this nature. These rates are set at a level designed to fairly compensate SSG for work it performs and to cover fixed costs and routine overhead expenses in these circumstances. SSG believes that this compensation structure is reasonable and comparable to compensation generally charged by investment banking and financial advisory firms of similar stature to SSG for comparable engagements, both in and out of court.

11.     To the best of my knowledge, (a) no commitments have been made or received by SSG with respect to compensation or payment in connection with these Chapter 11 Cases other than in accordance with the provisions of the Bankruptcy Code and (b) SSG has no agreement with any other entity to share with such entity any compensation received by SSG in connection with the Chapter 11 Cases.

12.     All employees, directors, managing directors, managers, senior managers, and senior associates of SSG who shall render services in these Chapter 11 Cases shall receive compensation on account of their services in these Chapter 11 Cases solely in their individual capacities, and not through any corporation, professional corporation, or limited liability company that such an employee, director, managing director, manager, senior manager, or senior associate may control or be a member of.

13.     Neither SSG nor any of its affiliates (including SSG Capital Advisors, LLC) will trade in any of the Debtors' equity or debt securities during this engagement. Any employees working on this engagement will not trade in debt or equity of the Debtors (or their creditors and equity holders) and will not share any confidential information with those that may engage in such trading.

## **INDEMNIFICATION**

14.     The Engagement Agreement includes a provision for the indemnification of SSG by the Debtors. I believe that the indemnification provision in the Engagement Agreement is generally consistent in all material respects with the indemnification provision contained in SSG's standard engagement agreement for both in- and out-of-court investment banking services. Further, similar indemnification arrangements have been approved by courts as part of SSG's retention in other bankruptcy matters.

15.     The indemnification provisions contained in the Engagement Agreement are important and necessary to limit the exposure of advisors to potential future liability for decisions made based on all material information reasonably available. Further, to the best of my knowledge, such indemnification provisions are consistent with the marketplace. I believe that the

indemnification provisions contained in the Engagement Agreement are appropriate and reasonable for the engagement of SSG as investment banker in these Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct to the best of my information, knowledge, and belief.

Dated: August 2, 2021

/s/ J. Scott Victor
By: J. Scott Victor
Managing Director
SSG Advisors, LLC

### Schedule 1
### List of Parties in Interest

**Debtors**
U.S. Tobacco Cooperative, Inc., U.S.
Flue-Cured Tobacco Growers, Inc.
Premier Manufacturing, Inc.
Franchise Wholesale Co., L.L.C.
Big South Distribution, LLC
King Maker Marketing, Inc.

**Board Members and Officers**
Oscar J. House, III
Keith H. Merrick
W. Michael Lynch
Russell G. Mancuso
Todd B. Compton
Timothy C. Lynch
Daniel J. Vacek
Danny P. Watkins, Jr.
Carlos M. Vickers
James T. Hill, Jr.
Jart Hudson
Cliff Keel
Charlie S. Batten
Tommy S. Kimbro
Lindsey T. Warren
Johnny M. Shelley

**Creditors and Interested Parties**
ABF Freight System Inc
Aerotek Commercial Staffing
Altadis USA Inc
AmeriGas
AT&T U-verse
Averitt Express
Case N' Keg
CEI - The Digital Office
Central District Alarm
CenturyLink
Charter Communications
Charter Communications (USFC)
Cheyenne International LLC
City of Raleigh

Class Plaintiffs in Fisher et al. v. Flue-
Cured Tobacco Cooperative Stabilization
Corporation
Class Plaintiffs in Speaks et al. v. U.S.
Tobacco Cooperative, Inc.
CliftonLarsonAllen LLP
Cogency Global
Colorado Dept Of Revenue
Comcast Business
Commercial Pest Management Ser
Crawford Sprinkler Co
Degesch America Inc
Dell Marketing LP
DHL Express-USA
Diligent Corporation
DJ Powers Co., Inc.
Dominion Energy NC
Douglas Company
DS SMITH PACKAGING - HOLLY SPR
Duke Energy Progress
East West Trading Co
Edward Kacsuta
EMG Electrical LLC
Estes Express Lines
EVERYTHING TOBACCO LLC
Farmer's Tobacco Co
FedEx
Fidelity Investments Inst Ops
First Horizon
First Horizon Bank
Fish Window Cleaning
GardaWorld Security Services
Georgia Dept of Revenue
Georgia Power
GFL Environmental
Global Laboratory Services
Global Tobacco
Golden Eagle Partnership LLC
Grand Strand Water & Sewer
Greenlight Community Broadband
Hughes Customat Inc
IBM Credit LLC
Idaho State Tax Commission
Interchange Express
Internal Revenue Service
Iowa Department Of Revenue

Iron Mountain
M Sales & Service, LLC
JT International U.S.A., Inc.
Kenneth Dasher
Kentucky State Treasurer
KT&G USA Corp
L J Rogers
Liggett Vector Brands
Lincoln National Life Ins Co
Main Distribution
MALCAM
McDermott Will & Emery
National Drayage Services
National Tobacco
NC Quick Pass Customer Svc Cen
New Image Global
Nippon Express USA, Inc.
North Carolina Department of Commerce,
Div. of Employment Security
North Carolina Department of Revenue
Optum Bank
Oscar House, CEO and President, US
Tobacco Cooperative, Inc.
Quality Builders Inc Raleigh
R+L Carriers
Radford Warehouse
Randy's Forkift & Equip Svc Co
Rebel Tobacco Inc
Red Stamp Inc
Renfro Supply Company
Republic Services #939
Rick Johnson
RingCentral Inc
Robert Half Technology
RR Donnelley
S&D WHOLESALE
Serena Wholesale
Shawnee Technologies Inc
Show Cigars
Sontiq, Inc.
South Carolina Dept of Revenue
Specialty Adhesives & Coatings
State of New Jersey
Stoll Keenon Ogden PLLC
Swedish Match
SWISHER INTERNATIONAL

3

Terminix
The GTNF Trust
ThyssenKrupp Elevator Corporation
Time Warner Cable (PA)
Time Warner Cable (USTC)
TMG International Inc
TN Dept Of Revenue
Tobacco Processing Services, L
TOWN OF CULPEPER VA
Town of Marion VA
Town of St Paul
Toyota Industries Commercial Finance,
Inc.
Tram Distribution Inc
Tristar
Truist Bank, as Administrative Agent,
Issuing Bank and Swingline Lender
Truist Bank, as Administrative Agent,
Issuing Bank and Swingline Lender
Turner Plumbing Service Inc
Uline
United States Attorney
Vector Tobacco
Verizon
Verizon Wireless
Virginia Department of Taxation
Watkins Tobacco Contractors, I
Wells Fargo Vendor Fin Serv
Wyrick Robbins Yates & Ponton
Yang Ming Marine Transport Cor
Young Moore and Henderson PA

**Bankruptcy Administrator**
Brian Behr
Karen Cook
Lesley Cavenaugh
Lynn Tingen
Marjorie Lynch
Parker Rumley
Raleigh Office
Rick Hinson
Tanya Aycock

**Professionals**

<u>Debtors:</u>

4

Ben Waller
Benjamin Thompson
Christina M. Sanfelippo
CliftonLarsonAllen
Cozen O'Connor
David R. Doyle
Hendren Redwine & Malone PLLC
Lee Whitman
Mark Felger
PJ Puryear
Rebecca Redwine
Simon Fraser
Wyrick Robbins Yates & Ponton LLP
BDO USA LLP
David Berliner
Baker Smith

<u>Bank Group:</u>
Adams & Reese
Nicholas F. Schandlbauer


<u>Class Plaintiffs:</u>
Kevin Sink
W. Sidney Aldridge

### Schedule 2
**SSG Schedule of Relationships with Parties in Interest**

SSG has worked with the firms BDO USA LLP and Cozen O'Connor and their respective professionals in matters unrelated to these Chapter 11 Cases.